UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAEL BUTCHER, | ) | |
| | ) | Civil Action No. 01 - 1505 |
| Plaintiff, | ) | |
| | ) | Magistrate Judge Lisa Pupo Lenihan |
| v. | ) | |
| | ) | |
| DRAVO CORPORATION, *et al.* | ) | Doc. Nos. 70, 74, 81 & 96 |
| | ) | |
| Defendants. | ) | |
| | ) | |

## **OPINION AND ORDER**

<u>LENIHAN</u>, M.J.

This case involves the interpretation and application of Sections 5(a) and (b) of the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 905(a) and (b) (1984), to claims of negligence and for indemnity and/or contribution, arising out of injuries Plaintiff sustained while working as a longshoreman for his employer, Price Inland Terminal Company ("Price"). Currently before the Court for disposition are two motions for summary judgment and two counter-motions for summary judgment.

Price has moved for summary judgment (Doc. No. 70) on: (1) the complaint filed by Plaintiff Michael Butcher and the third party complaint filed by Defendant and Third Party Plaintiff Dravo Corporation ("Dravo Corp.") in Civil Action 01-1505; (2) the third party complaint filed by Dravo Lime Corporation ("Dravo Lime") in Civil Action 02-1157; and (3) the complaint filed by Plaintiffs American Commercial Lines, LLC ("ACL") and American Commercial Barge Lines ("ACBL") in Civil Action 01-1357.

ACL and ACBL have moved for summary judgment (Doc. No. 74) on: (1) Michael

Butcher's damages claims against them in Civil Action No. 00-927; (2) Dravo Corp.'s negligence claims against them in Civil Action Nos. 00-927 and 01-1505; and (3) ACBL's claims for contractual indemnity against Dravo Lime in Civil Action No. 02-1157 and against Price in Civil Action No. 01-1357. In response to both summary judgment motions, Dravo Corp. and Dravo Lime (collectively, the "Dravo parties") have filed counter-motions for summary judgment against Price and ACL and ACBL (Doc. Nos. 81 & 96, respectively), which are also before the Court for disposition.

I.     **PROCEDURAL HISTORY**

This litigation consists of four separate lawsuits. The first civil action, a complaint for exoneration from or limitation of liability, was filed on May 11, 2000 by ACL and ACBL at Civil Action No. 00-927. In that case, a claim for damages (and amended claim) were filed by Michael Butcher (Doc. Nos. 9 & 20). Default was entered by the Clerk (Doc. No. 12) against Price, Dravo Lime, and two other entities not parties to these lawsuits. Subsequently, Dravo Corp. was granted leave to file a claim *nunc pro tunc* (Doc. No. 37).

The second civil action, alleging admiralty and maritime claims against Price under the LHWCA and for indemnity and/or contribution, was filed by ACL and ACBL at Civil Action 01-1357 on July 20, 2001. Price in turn filed a third party complaint against Dravo Lime Corporation ("Dravo Lime") (Doc. No. 11) asserting claims for negligence, indemnity and/or contribution.

The third civil action, commenced on August 8, 2001 by Michael Butcher at Civil Action No. 01-1505, is the present action. Butcher brought suit against Dravo Corporation ("Dravo Corp.") for negligence and strict liability under Section 402A of the Restatement (Second) of Torts alleging

personal injuries sustained on October 5, 1999 while working for Price. In response, Dravo Corp. filed a third-party complaint against ACL, ACBL, and Price (Doc. No. 8) for negligence, indemnity, and/or contribution. Price, in turn, filed a third party complaint against Dravo Lime (Doc. No. 11 in Civ.A. No. 01-1357[1]) asserting claims for negligence, indemnity and/or contribution. Subsequently, Dravo Lime filed a cross-claim against ACL and ACBL (Doc. No. 32) asserting claims for negligence, indemnity and/or contribution, and breach of contract.

The fourth and final piece of the litigation puzzle is the complaint filed on June 28, 2002 by ACL and ACBL against Dravo Lime at Civil Action No. 02-1157, alleging admiralty and maritime claims under the LHWCA and claims for negligence, indemnity and/or contribution. In turn, Dravo Lime filed a third-party complaint against Price (Doc. No. 8) for negligence, breach of contract, indemnity, and/or contribution.

While all four actions were pending, ACL and ACBL filed for bankruptcy under Chapter 11 on February 4, 2003, and all four actions were administratively closed. Almost four years later, on January 30, 2007, the cases were reopened and an order was entered consolidating all four actions, with Civil Action No. 01-1505 being designated as the lead case. After the completion of fact discovery, Price and ACL/ACBL moved for summary judgment, and Dravo Corp. and Dravo Lime filed counter-motions for summary judgment. The motions have been fully briefed and responded to, and are now ripe for disposition.

---

1. In the same document, Price filed a third-party complaint in Civil Action No. 01-1357 *and* in Civil Action No. 01-1505 against Dravo Lime, but it was only docketed in the 01-1357 action (*see* Doc. No. 11).

## II.  **FACTS**

For the most part, the following material facts are not in dispute.  On October 5, 1999, Michael Butcher was employed by Price as a longshoreman.  On that date, Butcher was assisting in  the unloading of Barge DM-1878 ( "Barge"), specifically, the closing of a cover or lid on the Barge.  During the closing of the cover,  a pad-eye, to which the cable used to pull the lid closed was attached, pulled free from the lid.  Butcher, who was standing on the cover when the pad-eye broke loose, was flipped into the air and landed on the bottom deck of the Barge, sustaining serious personal injuries.  (Butcher's Add'l Stmts. Relevant to Price's Mot. for Summ. J. (Doc. No. 88),  ¶¶ 79, 83.)  Butcher sustained these injuries while acting within the course and scope of his employment.   Under the LHWHA, Butcher has received and continues to receive workers' compensation benefits from Price as a result of these work related injuries.

Barge DM-1878 was manufactured by Dravo Corp. and sold to a third-party in 1977.[2]  At the time of the accident, ACL owned the Barge and had chartered it to ACBL.[3]  Dravo Lime, which mines and sells bulk lime, contracted with ACBL to provide barge transportation for the shipment of lime from a Dravo Lime facility to its customers.  The terms of this agreement were originally set forth in the Transportation Agreement dated October 3, 1995 between Dravo Lime and National Marine, and the Addendum thereto ("Transportation Agreement"), which extended the term of that

---

2.  The Dravo parties further state that an inspection of the lifting eye after the accident revealed that the lifting eye was not part of the original design, but was added by an unknown third-party.  ACL/ACBL dispute this statement as not being supported by any evidence in the record.

3.  In the late 1990s, ACBL acquired the assets of National Marine, including its barges and the Transportation Agreement and Addendum thereto.  (ACL/ACBL's Concise Stmt. Mat. Facts (Doc. No. 75), ¶6.)

agreement through December 31, 2001.[4] (Tab A, App. in Supp. of ACL/ACBL's Mot. for Summ. J. (Doc. No. 78).) ACBL and Dravo Lime also entered into the Contract of Affreightment dated March 1, 1999, which includes the parties' agreement regarding barge transportation of Dravo Lime's lime product and provides for the semi-annual adjustment of the freight rate and daily demurrage through December 31, 2008.[5] (*Id.*) Dravo Lime contracted with Price to unload its lime from ACBL's barges onto Price's facility, store the lime, and then load it onto trucks (which were not owned by Price) for transport from Price's facility to customers of Dravo Lime, as more fully set forth in the Amended and Restated Terminaling Agreement dated March 1, 1999 ("Terminaling Agreement") between Dravo Lime and Price.[6] (Ex. 10, App. in Supp. of Price's Mot. Summ. J. (Doc. No. 73).)

ACBL delivered empty barges to Dravo Lime's empty barge fleeting area, and Dravo Lime or its contractor then moved the empty barges to Dravo Lime's loading area. Dravo Lime used its employees to load these barges at its facility in Maysville, Kentucky. ACBL provided the crew necessary to transport the barges containing Dravo Lime's product to the fleeting area at the destination requested by Dravo Lime. For shipments going to Price, ACBL normally dropped the barges off at Neale's Towing,[7] with whom ACBL had contracted to deliver the loaded barges to Price. Once a barge was delivered to Neale's Towing's fleeting area, Dravo Lime was not involved

---

4. The relevant terms of the Transportation Agreement are discussed *infra* in Part III. The Dravo parties contend that the Transportation Agreement is not enforceable.

5. The relevant terms of the Contract of Affreightment are discussed *infra* in Part III.

6. The relevant provisions of the Terminaling Agreement are discussed *infra* in Part III.

7. Neale's Towing is a fleeting facility and towing company located in Parkersburg, West Virginia, approximately 10 miles from Price. Occasionally, Joe S. Towing Co. of Vienna, Ohio moved barges to and from Price's fleeting area.

in the coordination of either the delivery of the loaded barge to Price's facility or the return of the empty barge back to Neale's Towing's facility. (Doc. 88, ¶ 56.)[8] Neale's Towing and Price communicated with each other regarding the timing of delivery to and recoupment of the barges from Price's fleeting area and/or unloading dock. When it was ready to unload a barge or have an empty barge picked up, Price would contact Neale's Towing to request delivery or pick-up, and Neale's would move the barge to or from Price using its own crew. When Neale's Towing dropped off a barge to be unloaded at Price, it is unclear whether Neale's crew or employees of Price actually tied up the barge. Price possessed a tow boat which was operated by Price employees and was used to move barges into position and back and forth between its fleeting and unloading areas, after they were dropped off by Neale's Towing.

Price's deck hands would facilitate the fleeting process by disconnecting a barge from its moorings in the fleeting area and then notifying the towboat pilot that he could proceed to move the barge to the unloading area. (ACL/ACBL's Supp. Material Facts in Resp. to Price's Concise Stmt. of Material Facts (Doc. No. 93), ¶ 60.) In addition, employees of Price put markers or hazard lights on the corners of barges kept overnight at their facility, including the lime barges, and they were responsible for removing and placing the markers or hazard lights when moving barges in and out of Price's fleeting areas. (Doc. No. 93, ¶ 61; Doc. No. 88, ¶¶ 64-65.) A Price deckhand would then ride either the towboat or the barge to the unloading area. (Doc. No. 93, ¶ 62.) Once the towboat reached the unloading area, the Price deckhand–with the assistance of Price's crane helper or laborer–would tell the towboat pilot how far they were from the dock and tie off the barge. (*Id.* at

---

8. None of the parties filed any response to Butcher's additional statements relevant to Price's motion for summary judgment (Doc. No. 88, ¶¶ 49-83).

¶ 63.)  Price's deckhands would tie barges, wire them to other barges, and move them into the dock

so that the crane could unload them.  (*Id.* at ¶ 64.)  Price's laborers would help the crane operator

by moving barges back and forth, untying them and tying them back up at the dock.  (*Id.* at ¶ 65.)

     As part of the loading and unloading process, the crews employed by Dravo Lime and Price

would open and close the barge covers.  Barge covers are mounted on wheels.  (Doc. No. 75, ¶16.)

The barge covers are opened and closed by attaching cables to either a pulling lug or lifting lugs on

the covers and then pulling on the cables.[9]  (*Id.* at ¶ 17.)  A pulling lug is located along the center

line of the cover and is designed to help the cover roll along and go parallel to the tracks.  (Carter

Dep. at 148-49.)  The lifting lugs, or pad-eyes, are located in the four corners of the covers and are

more designed to lift the covers, although a lifting lug can be used to pull a cover. (Carter Dep. at

148.)  A pad-eye is a steel loop that is welded to a square plate called a doubler which, in turn, is

welded to the top of the cover.  (Doc. No. 75, ¶ 20.)  One of the ways to determine the fitness of a

weld is by visual inspection.  (*Id.* at ¶ 21.)  If a pad-eye's doubler becomes partially separated from

the barge cover, this can be discovered by a visual inspection, typically by noting whether the lime

residue on the pad-eye was cracked or loosened.  (*Id.* at ¶ 22.)  A crack appears as a dark line in

sharp contrast to the white lime residue.  (*Id.*)  However, the absence of any cracks does not

necessarily mean the weld is sound.  (Doc. No. 85, ¶ 22; Doc. No. 97, ¶ 22.)

---

9.  Apparently, in attaching the cables to the covers, several different methods are employed, but the parties dispute which of these methods are standard and/or proper. One method involves a center-line pull, with a cable attached to a pulling lug (Doc. No. 75, ¶ 17); another method involves connecting a sling to the two lifting lugs (known as pad-eyes) on either side of the cover, and pulling straight through the middle (*id.* at ¶ 18).  In addition, the parties dispute whether the pad-eyes are intended to be used only for lifting the barge covers, rather than for pulling the covers open and closed.  (*Id.* at ¶ 19; Butcher's Resp. (Doc. No. 85) at ¶ 19; Price's Resp. (Doc. No. 91) at ¶ 19; Dravo parties' Resp. (Doc. No. 97) at ¶19.)  In any event, customarily, Price's employees/crew would move the hook from one pad-eye to another when there was a problem with closing a cover.  (Doc. No. 85, ¶ 66 (citing Miller Dep. at 19).)

When the empty or loaded lime barges were located at Dravo Lime's facilities, Dravo Lime employees filled out barge inspection reports and forwarded them to ACBL. (Price's Concise Stmt. of Material Facts in Supp. of its Mot. for Summ. J.(Doc. No. 72), ¶ 39; Dravo Parties' Resp. Concise Stmt. (Doc. No. 82), ¶ 39.) If welding or more significant repairs were required to a barge, ACBL would be contacted to arrange for repairs to be made. (Doc. No. 72, ¶ 40.) For example, Renee Tracanna of Dravo Lime testified that whenever she became aware of a loose pad-eye, pulling lug or lifting lug, she reported it to ACBL, and it would always be repaired.[10] (Tracanna Dep. at pp. 16,19-20 (Doc. No. 78, Tab L).)

C&C Marine Maintenance, Inc. ("C&C") performed maintenance on ACBL's barges, including Barge DM-1878. (Doc. No. 75, ¶ 23.) John Wicker at ACBL requested and/or approved all repairs to its barges by C&C. (Buchanan Dep. at 9 (Doc. 78, Tab G).) Generally, C&C was contacted by Bob Carter at Dravo Lime regarding cleaning the barges, and received calls or faxes from him about a problem with a barge to look for when the barge came in for maintenance or repairs, but Carter never requested repairs be made nor did he authorize them. (*Id.* at 15, 38-39.) It was C&C's practice that every time a barge came in for work, a visual inspection was conducted of the fittings and welds, which included removing the lime residue from a barge's welds to inspect them. (*Id.* at 24-25.) C&C would use a hammer or similar tool to chip away lime residue in order to inspect the welds. (Doc. No. 75, ¶ 24.) C&C's inspection practice included the inspection of doubler plates and lug welds on pad-eyes. (*Id.* at ¶ 25.) If C&C discovered a bad weld or a pad-eye

_____

10. Butcher submits that an issue of fact exists as to whether defects with the cover on Barge DM-1878 were properly inspected and/or repaired prior to his accident, and cites in support the testimony of John Buchanan from C&C to the effect that he could not locate any C&C records to confirm or deny any repairs/inspections of Barge DM-1878. (Doc. No. 85, ¶ 31.) The Court notes, however, that the record does contain C&C records from other sources showing that repairs were made to Barge DM-1878 in the two years preceding the accident, as discussed *infra.*

that appeared to be coming off, C&C would report that information to ACBL and make the necessary repair. (*Id.* at ¶ 26.) After the repairs were made, C&C would have a foreman or another set of welders inspect the barge again to make sure nothing was missed. (*Id.* at ¶ 27.)

Specifically, with regard to Barge DM-1878, C&C performed maintenance (cleaning/washing) and/or repairs on the Barge and/or its covers on four occasions from October 27, 1997 through July 30, 1999. (Doc. No. 78, Tab M.) In addition, the barge history report on Barge DM-1878 indicates that repairs were made by C&C on July 30, 1999, August 17, 1999, and September 21, 1999, but does not indicate the nature of the repairs. (Second Wicker Dep. at 32-33 (Doc. No. 78, Ex. H); Ex. K, ACL/ACBL's Second Resp. App. (Doc. No. 111).) Also, correspondence was sent to C&C from Dravo Lime on two occasions indicating repairs needed to be made: (1) On April 6, 1997, it was noted that the low cover # 5 had a pulling eye that was ready to come off and needed to be welded; and (2) on October 20, 1997, bucket damage was reported. (Doc. No. 78, Tab M.) Dravo Lime's Maysville division also completed three barge inspection reports on Barge DM-1878 between August 4 and September 28, 1999. (*Id.* at Tab N.) On August 4, 1999, the inspection report noted that three of the four wheels on cover # 1 needed to be replaced. (*Id.*) On August 23, 1999, the inspection report noted that at least three of the wheels on the #1 cover were replaced, and on September 28, 1999, the reports indicate that two of the wheels were off on several covers, including the #1 cover. (*Id.*) In addition, in facsimile correspondence dated August 11, 1999, Bob Carter at Dravo Lime informed Dave Fleming at ACBL of a water leak in Barge DM-1878 and of his understanding that after the Barge was unloaded it would go to repair. (*Id.*) In facsimile correspondence dated August 30, 1999, Carter informed Fleming that the barge inspection reports indicated that Barge DM-1878 has had repeated problems with the wheels on the #1 and #2

covers, which appeared to be related to some distortion in the port coaming.  (*Id.*) Around that same time, the lime barge report sheet from the Pleasants Power Station noted a dent in cover #1 and that the "covers moved moderate through the entire unloading operation."  (*Id.* at Tab O.)  Dravo Lime did not report any problems with the cover #1 pad-eye on Barge DM-1878.  (Doc. No. 75, ¶ 34.)

As part of the loading process, Dravo Lime employees would have inspected the pad-eyes on the Barge's covers.  (*Id.* at ¶ 39.)  The covers were then closed.  (*Id.*)  During the process of transporting the Barge to Price for unloading, ACBL would not have reopened the covers, and the covers would have remained closed until the Barge was delivered to Price for unloading.  (*Id.* at ¶ 40.)

John Wicker of ACBL would periodically inspect the lime barges, which included a visual inspection of the welds.  (Doc. No. 72, ¶ 38; Second Wicker Dep. at 17-18.)  He would not, however, scrape or chip off any heavy lime build-up on the covers or fixtures in order to inspect the welds.  (Second Wicker Dep. at 17-18.)  ACBL made the decisions regarding when to take a barge out of service or drydock it in order to perform repairs.  (Doc. No. 72, ¶ 41.)  Wicker testified that he would have expected that if Dravo Lime noticed something was wrong with a barge or encountered a problem with removing or closing the covers, that Dravo Lime would have reported it to him.  (Second Wicker Dep. at 45.)  He further testified that if Price experienced a problem with a barge or removing or closing covers during unloading, he expected Price to inform Dravo Lime, and Dravo Lime to notify him.  (*Id.* at 45-46.)

Pursuant to the Terminaling Agreement, Price was expected to inspect barges carrying Dravo Lime's lime product ("lime barges") upon arrival and report any observed problems with said barges

to Dravo Lime's Supervisor of Field Services, Bob Carter, either via fax or phone call.[11] (Doc. No. 75, ¶ 35; Doc. No. 88, ¶¶ 60-61.)[12] Price did not have any employees dedicated solely to performing maintenance on the lime barges that it unloaded (Doc. No. 72, ¶ 43), but Price would resolve minor maintenance problems, such as putting lids back on track and pumping out voids when necessary (Doc. No. 88, ¶¶ 62-63). Price's policy was to inspect pad-eyes before attaching cables to them, and Price's employees would not attach a hook to a pad-eye that had an obvious problem upon visual inspection. (Doc. No. 75, ¶ 36.) Price did not observe any problems with the subject pad-eye prior to the accident. (*Id.* at ¶ 37.)

On the day of Butcher's accident, employees of Price had trouble with the covers pulling hard on Barge DM-1878, and when they opened the covers, they also noticed the Barge had a water leak. (Doc. No. 88, ¶ 67.) The Price employees notified Donald Wagner, the plant superintendent for Price, who completed a form noting both the water leak and that the covers were pulling hard. (*Id.* at ¶¶ 68-69.) Wagner then called Bob Carter of Dravo Lime to notify him of the two problems and was informed that Carter was on his way to Price's terminal. (*Id.* at ¶¶ 70-71.) When Carter arrived at Price's facility, Wagner showed Carter the form he had completed earlier regarding the two problems with Barge DM-1878. (*Id.* at ¶ 72.) Carter entered onto the Barge prior to Butcher's accident, but focused on the water leak. (*Id.* at ¶ 73.) Carter left Price's facility before Price's crew

---

11. The Dravo parties and Butcher submit that an issue of fact exists as to whether Price actually conducted an inspection of Barge DM-1878 and/or observed any problems with the pad-eye on cover #1 when the Barge arrived on October 5, 1999. (Doc. No. 97, ¶ 35; Doc. No. 85, ¶ 35.) However, neither the Dravo parties nor Butcher points to any evidence in the record which actually creates a factual dispute on this point.

12. None of the parties filed any response to Butcher's Additional Statements of Fact relevant to Price's summary judgment motion (Doc. No. 88, ¶¶ 49-83), and therefore, the Court deems these statements admitted to the extent they are factual in nature, as opposed to legal conclusions, and supported by the record.

commenced their attempt to close the covers on Barge DM-1878. (*Id.* at ¶ 74.) Neither Carter nor Wagner gave any instructions to Price's employees regarding the closing of the covers.[13] (*Id.* at ¶ 75.)

Late in the afternoon of October 5, 1999, Butcher and another employee of Price, Stephen Petty, were attempting to close the covers on Barge DM-1878, with Petty operating the front end loader (on the dock) that was pulling the cable attached to the covers. (*Id.* at ¶¶ 76-77.) Another Price employee, Charles Miller, arrived at the Barge when the last cover (cover no. 1) was almost closed. (*Id.* at ¶ 78.) Miller and Butcher were both positioned on the barge cover when the accident occurred.[14] (*Id.* at ¶ 79.) Miller moved the cable hook from the center pad-eye at the front of the Barge to a pad-eye at the left-hand corner (or starboard side) of the Barge, because the cover would not close the final foot when positioned in the front center pad-eye.[15] (*Id.* at ¶¶ 80-81.) Before attaching the hook to the pad-eye at the left-hand corner, Miller stated he looked at the pad-eye and did not see anything wrong with it. (Miller Dep. at 20.) After Miller moved the cable hook, a signal was given to Petty, who began to move the front end loader, which in turn pulled the cable. (Doc. No. 75, ¶ 82.) Within a few seconds of when Petty began moving the front end loader, the doubler (with the pad-eye still attached) broke loose, and Butcher was flipped into the air and landed on the

---

13. In addition, Dravo Lime did not direct Price to use a particular procedure when opening or closing barge lids. (Doc. No. 88, ¶ 66.)

14. In their Supplemental Material Facts (Doc. No. 93), ACL/ACBL state that standing on the cover as it was being pulled was contrary to both Price's and Dravo Lime's policies. (Doc. No. 93, ¶ 71.) Price and Dravo Lime admit this statement, but Butcher denies he was in violation of Price's and Dravo Lime's policies. (Doc. Nos. 85, 91 & 97, ¶ 45.)

15. Miller testified that it was customary for hooks to be moved to other pad-eyes when there was a problem with closing the cover. (Doc. No. 85, ¶ 66 (citing Miller Dep. at 19).)

bottom deck of the Barge.[16]  (*Id.* at 83.)

On the day after the accident, Bob Carter from Dravo Lime and John Wicker from ACBL each independently inspected the Barge.  Carter testified that the spot on the cover where the pad-eye's doubler was previously attached was marked by a clean black square.  (Doc. No. 75, ¶ 49.)  Similarly, Wicker testified that the spot was marked by "a brown square in the middle of a white piece of steel."  (*Id.*)  The area surrounding the square patch was covered with white lime residue.  (*Id.* at ¶ 50.)  Wicker also testified that it appeared that the weld had broken all the way around because there was a fresh break all the way around.  (Second Wicker Dep. at 36-37.)

Robert Pennock, general manager of Price, also testified as to the condition of the pad-eye and weld shortly after the accident:

> The pad eye was about . . . two and a half inches square that had been welded down to the deck of the lid.  The weld was–it's what I would call an inferior weld to start with.  It was not bonded well to both the pad eye and to the lid section of the barge.

Pennock Dep. at 26.  After counsel for ACL/ACBL noted a continuing objection–that the questions about the weld called for speculation; expert opinion–Pennock further testified:

| PENNOCK: | I mean, I know what a good weld looks like. |
|---|---|
| MR. CAROSELLI: | How do you know what a good weld looks like? |
| PENNOCK: | I've had experience around welding all my life.  When it's not welded and bonded in both pieces, where there are pieces it misses, that was obviously inferior. |
| MR. CAROSELLI: | When you looked at that weld was there any discoloration to any part of the weld? |
| PENNOCK: | There was only a small section of the pad eye that had a fresh break. |
| MR. CAROSELLI: | Tell me what you mean by fresh break. |
| PENNOCK: | Where the metal was shiny, the actual shiny metal where it had just broken off.  Other portions–I would say it may have |

---

16.  The parties dispute as to whether this was a proper method for closing the lid.

13

been attached.  I'm having trouble with exact memory.  I can't remember exactly.  If it was 10 inches around it, there was probably 2 inches of it, 3 inches of it that had a fresh break.  The other parts of it had been separated for some time and had discolored to a rust color.

*Id.* at 26-27.  With regard to the Price's policy on inspecting the barges, in particular pad-eyes,

Pennock testified as follows:

| | |
|---|---|
| MR. CAROSELLI: | How extensive of an inspection is the employee to make of the pad eye before connecting the hook to it? |
| PENNOCK: | Look at it, see if it looks safe and go on. |
| MR. CAROSELLI: | Is the person to move the lime away from the pad eye to see if it's adhering to the deck or to the lid or the covers? |
| PENNOCK: | No. |
| MR. CAROSELLI: | That's not been a policy. |
| PENNOCK: | No. |
| MR. CAROSELLI: | Have you ever heard about pad eyes separating from lids or covers anywhere? |
| PENNOCK: | Not particularly, no. |
| MR. CAROSELLI: | . . . In your experience have you ever seen or heard about the pad eye being loose? |
| PENNOCK: | No. |

*Id.* at 38-39.  When later questioned by ACL/ACBL's counsel on whether it would be reasonable

under Price's inspection policy to brush away loose dust or loose lime or something like that on the

pad-eye that was about to be hooked up to and look at it before hooking up to it, Pennock responded

in the negative, explaining:

Most of the time on these lime barges when there's lime on there it has taken the form–it's powdered lime that got wet.  It's taken more the form of rock, therefore, it's a solid material.   And when you inspect something–it would be like paint.  It's related to paint.  You have painted this pad eye and it's got this coating over it.  And if the pad eye–if it looked like the paint was cracked or the lime had broken loose around it, then you would be suspicious of it and look further.  In this case apparently the lime was not broken.  I mean, I'm not saying in this case it wasn't. I'm just saying that's what I wouldn't think that that would be part of [Price's] policy.  The same as it wouldn't be part of [Price's] policy to remove the paint from the pad

14

eye to see if there was anything underneath it.

Pennock Dep. at 51-52. Pennock further stated that after the pad-eye came off the barge cover, he observed lime caked on top of the pad-eye base, as well as around the blank area on the cover from where the pad-eye had been. (*Id*. at 53-54.)

As for the Barge covers themselves, subsequent testing revealed that they rolled properly without any problems. (Doc. No. 75, ¶ 51.)

## III.   <u>THE CONTRACTS</u>

Some of the rights and responsibilities of the parties are contained in three written agreements–the Transportation Agreement between National Marine, ACBL's predecessor in interest, and Dravo Lime[17]; the Contract of Affreightment between ACBL and Dravo Lime; and, the Terminaling Agreement between Dravo Lime and Price. The pertinent sections of those three agreements are set forth below.

The Transportation Agreement, dated October 3, 1995, between National Marine and Dravo Lime, provided for the transportation of lime from Maysville, KY to Porterfield, OH, for the loading period of September 1, 1995 through December 31, 1995. (Doc. No. 78, Tab A.) By addendum, the Transportation Agreement was extended through December 31, 2001. (*Id.*) Paragraph 18 of the Transportation Agreement sets forth the rights and responsibilities of the parties with regard to loading, stowing, securing and unloading the cargo (lime). In particular, Paragraph 18 states that Dravo Lime:

---

17. When ACBL acquired the assets of National Marine in the late 1990's, ACBL assumed the Transportation Agreement and Addendum 1 thereto, and ACBL continued to transport lime for Dravo Lime, pursuant to this agreement. (Doc. No. 97, ¶ 64.)

shall provide all personnel [and] equipment necessary to effect proper loading and unloading of cargo and warrants that cargo shall be properly loaded, stowed and secured in the barge, and agree [to] release, indemnify, defend and hold [National Marine] harmless with respect to any loss, damage, injury, death, fine or penalty resulting from any breach of this warranty even with negligence on the part of [Dravo Lime] and even though any such loss, damage, injury, death, fine or penalty shall result in part from the fault or neglect of [National Marine], strict liab[ility] or unseaworthiness of any barge or vessel.

(*Id.*) The Transportation Agreement also provides that it supersedes all other agreements, bills of lading or other documentation issued for shipment of the Dravo Lime's lime and shall exclusively be deemed the governing contract of carriage. (*Id.* at ¶ 26.)

On March 1, 1999, ACBL and Dravo Lime entered into a Contract of Affreightment, after negotiating a lower freight rate and the daily demurrage charge, in response to an ultimatum from from one of Dravo Lime's customers to either lower the price of lime or lose its business. (Doc. No. 97, ¶¶ 65-66.) The Contract of Affreightment provides, among other things: for the semi-annual adjustment of the freight rate and daily demurrage through December 31, 2008; that Dravo Lime is responsible for the proper loading and unloading of the cargo (¶ 11); that Dravo Lime agrees that while barges are in its care and custody or that of its agents, all U.S. Coast Guard requirements shall be complied with, including adequately mooring the barges with warning lights properly displayed (¶ 13); that ACBL agrees to "tender barges which are seaworthy in a condition suitable for the cargo to be carried" (¶14); that ACBL shall move the cargo at its convenience, either alone or with one or more other craft, and shall have the right to shift or interchange the tow from one towing vessel to another, or to procure towage from any other non-ACBL owned or operated vessel, to tie off the tow at any point and for any purpose, and to deviate from its route (¶15); that ACBL shall be liable for any loss of or damage to the shipment of Dravo Lime's cargo to the extent provided by law (¶

19); and, that ACBL shall not be liable for and Dravo Lime "agrees to release, indemnify and hold harmless [ACBL], its subcontractors, affiliates and the vessels employed by it or them, in the performance of the cargo movements [under the Contract of Affreightment] for any loss of, damage to or expense in connection with any article shipped . . ." (¶20). (Doc. No. 78, Tab A.) The Contract of Affreightment contains neither a superseding agreement clause, nor an integration clause.[18]

With regard to the Terminaling Agreement, Article Two states that Price shall provide the following services to Dravo Lime:

    (a)     receiving loaded barges at the Price dock;
    (b)     unloading barges, shifting barges and placing barges for pickup;
    (c)     storing lime;
    (d)     loading trucks from storage facility;
    (e)     weighing loaded trucks;
    (f)     issuing and controlling Dravo Lime bills of lading;
    (g)     advising Dravo Lime on a daily basis of the previous day's activities, the form of such advice as the parties shall mutually agree; and
    (h)     clean, sweep and properly dispose of cargo spilled onto the working surfaces of each barge after unloading.

(Doc. No. 73, Ex. 10.)[19] Article Three of the Terminaling Agreement sets forth certain unloading and storage procedures and controls that Price shall maintain, including:

---

18. The Dravo parties maintain that the Contract of Affreightment contains a full listing of the conditions and terms of the new barge transportation agreement between Dravo Lime and ACBL. (Doc. No. 97, ¶ 67.) ACBL denies this statement and counters that the Contract of Affreightment was executed solely to memorialize the new freight rate, and was not intended to supersede any operational aspects of the parties' ongoing contractual relationship, noting that the Contract of Affreightment does not contain an integration clause. (ACL/ACBL's Resp.to Dravo's AMF (Doc. No.110), ¶ 67.)

19. According to *Black's Law Dictionary,* 5th ed. (West 1979), a stevedore is a "person employed in loading and unloading vessels." Thus, when Price unloaded Dravo Lime's lime from ACBL's barges, stored it, and loaded it onto trucks, Price was engaging in stevedoring activities.

(a)     Barges shall be inspected upon arrival at the Price Dock and any damage to the barges or barge covers shall be reported to Dravo Lime;

(b)     The lime shall be inspected in the barge upon arrival at the Price dock and any damage to the lime that may be obvious by visual inspection shall be reported to Dravo Lime. In such event, Price shall not unload the barge without approval from Dravo Lime.

. . .

(*Id.*) Thus, Article Three sets forth Price's responsibilities as to inspecting the barges, barge covers, and lime, and reporting any damage thereto.

In Article Four of the Terminaling Agreement, Price agrees to assume sole responsibility for the following:

(a)     the operation of the facility and employment of necessary personnel as may be required for Price to meet its obligations [under the Terminaling Agreement];

(b)     the maintenance and repair of all equipment and facilities necessary for Price to meet its obligations [under the Terminaling Agreement];[20] and

(c)     the condition of the lime from the time the barge has been inspected and unloaded by Price until the lime has been loaded onto trucks from the storage silos.

(*Id.*)

Article Eighteen of the Terminaling Agreement sets forth the respective responsibilities that Price and Dravo Lime agreed to assume with regard to the delivery of lime by barge. Specifically, Price agreed:

to receive, unload, shift, care for without cost to Dravo Lime and be responsible for all barge[s] tendered by Dravo Lime or its towing contractor from the time the barges are tendered and properly secured

---

20.  It appears that the parties all agree that Article Four, § (b) does not address Price's obligations vis a vis maintenance and repair of the lime barges, although there is some disagreement over what Dravo Lime's expectations were regarding Price's obligation to maintain and repair the lime barges, but the latter issue in not material to outcome here.

at the unloading point until the time they are picked up by the towboat after completion of unloading, during all of which time such barges shall be deemed to be in the exclusive care, custody and control of Price, and to be responsible for any damage to barge structures during any such operations, normal wear and tear excepted, provided that pickup shall be promptly made by Dravo Lime or its towing contractor and provided further that Price shall not be responsible for any loss or damage arising as a result of barges being delivered when in danger of sinking. Price warrants that, during all of the time such barges are in the care, custody and control of Price, the barges shall be adequately moored with warning lights properly displayed as required by U.S. Coast Guard regulations. A barge shall be determined to have been delivered by Dravo Lime or its towing contractor when it has been properly secured at the dock or mooring facility of Price, and shall be determined to be picked up by Dravo Lime or its towing contractor when untied by Dravo Lime or its towing contractor from such dock or mooring facility.

Terminaling Agreement, Art. Eighteen, § (a)(2).[21] Dravo Lime agreed to assume the following responsibilities with regard to delivery of lime by barge:

(1) to provide a sufficient number of barges and adequate towing capacity for the delivery of lime in the amount and at the times required hereby;

(2) to keep the barges used for this purpose in seaworthy condition and to remove empty barges from the unloading point promptly when a tow is available therefore; and

(3) to indemnify and save Price harmless from all claims for personal injury, including death, and property damage arising out of or in connection with the transportation and delivery of all lime hereunder by Dravo Lime, unless caused by the negligence of Price.

*Id.* at § (b)(1)-(3).

---

21. Butcher, ACL/ACBL, Dravo Lime, and Dravo Corp. maintain that in addition to performing stevedoring services, Price was also an "owner *pro hac vice*" of Barge DM-1878, by virtue of the language in Article Eighteen, Part 2 above, stating that the "barges shall be deemed to be in the exclusive care, custody and control of Price" from the time the barges are tendered and properly secured at the unloading point until they are picked up by the towboat after unloading is completed. The position advanced by Butcher, ACL/ACBL, Dravo Lime and Dravo Corp. raises a question of law, the resolution of which will determine the outcome of some of the pending motions.

Finally, Article Thirteen of the Terminaling Agreement contains the following indemnity provision:

> Price shall protect, hold harmless, defend and indemnify Dravo Lime, its affiliated companies, customers, agents, servants, employees, contractors and subcontractors from and against all claims, penalties, fines, assessments, liabilities and expenses, in any way arising out of (i) any claims for death or injury to persons or property, or (ii) any claim of breach of any requirement imposed by any federal, state or local governmental authority, whether judicial, administrative or legislative, arising out of any act or omission of Price, its agents, servants, employees, contractors and subcontractors or out of the performance of work pursuant to this Agreement, except as may be caused by the sole negligence of Dravo Lime, its agents, servants or employees.

*Id.* at Art. Thirteen (Doc. No.73, Ex. 10.)[22]  ACBL submits that as Dravo Lime's towing contractor, it is a third party beneficiary of this indemnity provision by virtue of the inclusion of the term "contractors" of Dravo Lime in Article Thirteen.

---

22. In conjunction with the indemnity clause, Price agreed to procure and maintain workers' compensation insurance and longshoremen and harbor workers' coverage, employer's liability protection, including coverage for maritime exposure, and comprehensive general liability insurance (as well as other types of insurance coverage), during the term of the Agreement, satisfactory to Dravo Lime, and to name Dravo Lime and any of its subsidiary or affiliated companies as named insureds on these policies. Terminaling Agreement, Art. Twelve, §§ (a) & (c).

# IV.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56 (c).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

More specifically, the moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact.  Once that burden has been met, the nonmoving party must set forth "specific facts showing that there is a *genuine issue for trial*" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis added by *Matsushita* Court).  An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When the parties have filed cross-motions for summary judgment, as in this case, the summary judgment standard remains the same.  *Transguard Ins. Co. of Am., Inc. v. Hinchey*, 464 F.Supp.2d 425, 430 (M.D.Pa. 2006).  "When confronted with cross-motions for summary judgment, . . . 'the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the summary judgment standard.'" *Id.* (quoting *Marciniak v. Prudential Fin. Ins. Co. of Am.*, No. 05-4456, 184 Fed. Appx. 266, 270

(3d Cir. June 21, 2006)).  "If review of [the] cross-motions reveals no genuine issue of material fact, then judgment may be entered in favor of the party deserving of judgment in light of the law and undisputed facts."  *Id.*  (citing *Iberia Foods Corp. v. Romeo,* 150 F.3d 298, 302 (3d Cir. 1998)).

## V.    ANALYSIS

### A.    Price's Motion for Summary Judgment

Price contends that as a compensation-paying employer, it is immune from third party claims for indemnification and/or contribution by virtue of Section 5(a) of the LHWCA, 33 U.S.C. § 905(a), to the extent that as an employer, it is immune from common law liability to its employees, citing *Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp.,* 342 U.S. 282, 285-86 (1952).  Nonetheless, Price submits that it may be found liable on the negligence, contribution and indemnity claims *only if* Price is determined to be liable to Butcher as a vessel owner or "owner *pro hac vice*," citing *Griffith v. Wheeling Pittsburgh Steel Corp.,* 521 F.2d 31 (3d Cir. 1975) ("*Griffith I*") (emphasis added).  Price maintains that the undisputed evidence of record shows that it is not an "owner *pro hac vice*," and therefore, it is entitled to judgment as a matter of law in its favor and against Dravo Corp. and Dravo Lime on their claims for negligence, indemnity and/or contribution, and against ACL/ACBL on its claims for indemnity and/or contribution.   With regard to Dravo Lime's contractual claims for damages and indemnity against Price in the third-party complaint filed in Civil Action No. 02-1157, Price argues that these claims are wholly dependent on whether Price is determined to be an "owner *pro hac vice*," and since the evidence does not support such a finding, contractual indemnity provisions between a stevedore and vessel owner (Dravo Lime) are void and unenforceable by virtue of Section 5(b) of the LHWCA, 33 U.S.C. § 905(b), citing *Lopez v. A/S D/S*

*Svendborg,* 581 F.2d 319, 328 (2d Cir. 1978). Therefore, Price contends, Dravo Lime's contractual claims must also fail.

In his response in opposition to summary judgment, Butcher argues, based on *Griffith, supra,*[23] and *Blair v. U. S. Steel Corp.,* 444 F.2d 1390 (3d Cir. 1971), that where, as here, a party takes control and possession of a barge for loading and unloading purposes, it will be deemed to be an "owner *pro hac vice*." As further evidence of Price's status as "owner *pro hac vice*," Butcher points to the Terminaling Agreement, specifically, Article Eighteen, wherein Price agrees that the barges shall be deemed to be in its "exclusive care, custody and control" when dropped off for unloading until picked up after completion of unloading. Butcher maintains that this language alone dictates a finding that Price was the "owner *pro hac vice*" of Barge DM-1878. Butcher requests, therefore, that Price's motion for summary judgment be denied.

Similarly in response, ACL/ACBL argue that the Terminaling Agreement gave Price exclusive possession and control over the Barge, and that Price actually exercised exclusive possession and control over the Barge by fleeting the Barge with its own towboat and through the use of cables operated by Price employees. Thus, ACL/ACBL maintain that Price became the Barge's "owner *pro hac vice*," and therefore, may be held liable in contribution for any damages that Butcher may recover. ACL/ACBL further argue that under Articles Thirteen and Eighteen of Price's Terminaling Agreement with Dravo Lime, Price is contractually obligated to indemnify ACBL, as Dravo Lime's towing contractor. Therefore, in the event it is determined that Price, as an "owner *pro hac vice*," negligently caused Butcher to sustain any damages, ACBL submits that Price be

---

23. Butcher also refers to a subsequent decision in *Griffith,* reported at 610 F.2d 116 (3d Cir. 1979), *vacated* 451 U.S. 9655 (1981), *reinstated* 657 F.2d 25 (3d Cir. 1981), *cert. den.* 456 U.S. 914 (1982) ("*Griffith II*").

required to indemnify it against any damages it might incur. Consequently, ACL/ACBL request that Price's motion for summary judgment be denied.[24]

Finally, The Dravo parties argue in response to Price's summary judgment motion that pursuant to the Terminaling Agreement, Price specifically agreed to assume "exclusive care, custody and control" of each barge from the time it was received by Price to the time it was picked up after unloading, and to inspect each barge upon its arrival and report any damage to the barge or barge covers to Dravo Lime. By assuming these contractual obligations, The Dravo parties argue that Price became the "owner *pro hac vice*" of Barge DM-1878, and possessed such ownership status at the time of Butcher's accident. The Dravo parties attempt to distinguish a number of the cases cited by Price in support of its argument that it is not an "owner *pro hac vice*," on the basis that unlike the case at bar, the specific relationship of the parties in the cited cases was unclear;[25] or that the cited cases actually support a finding that Price was an "owner *pro hac vice*";[26] or a demise charter, which is required for *pro hac vice* ownership of vessel,[27] exists here because Price assumed sole possession and control over the Barge under the Terminaling Agreement. Therefore, the Dravo

---

24. ACL/ACBL also raise a third argument, which is not responsive to Price's motion for summary judgment, but rather, appears to be in support of their own motion for summary judgment. Specifically, ACL/ACBL argue that as an "owner *pro hac vice*," Price may be held liable for any breaches of the turnover duty, the active operations duty, or the duty to intervene, *i.e.,* the *Scindia* duties. *See Scindia Steam Navigation Co., Ltd. v. De Los Santos,* 451 U.S. 156 (1981). This argument has no bearing on the preeminent issue of whether Price meets the definition of an owner *pro hac vice*, but rather, goes to whether Price, if it is, in fact, a vessel owner, was negligent. This argument puts the proverbial cart before the horse, and therefore, will not be considered in deciding Price's summary judgment motion. In fact, the Court need not address this argument at all since it has determined below that Price is not an owner *pro hac vice*.

25. *Ducote v. Int'l Operating Co. of La., Inc.,* 678 F.2d 543 (5th Cir. 1982).

26. *Stephenson v. Star-Kist Caribe, Inc.,* 598 F.2d 676, 679 (1st Cir. 1979); and *Olsen v. Todd Shipyards Corp.,* 435 F.Supp. 568, 571 (W.D. Wash. 1977).

27. *Aird, supra.*

parties contend that Price, as a vessel owner, can be held liable for the negligence of the vessel under the dual capacity doctrine, citing *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523 (1983). With regard to Price's argument that Dravo Lime's contractual indemnity claim must fail because it is wholly dependent on Price being found to be an owner *pro hac vice* of the Barge and the evidence of record fails to establish such ownership, the Dravo parties respond that Price's argument lacks merit. The Dravo parties submit that neither of them is a "vessel" under the LHWCA, and since Section 905(b) protects employers only from liability to the "vessel," a non-vessel may therefore enforce an indemnity provision against a maritime employer. In support of this position, the Dravo parties cite, 1 Thomas J. Schoenbaum, *Admiralty & Mar. Law,* § 7-14 (4th ed. 2004) (citing *Pippen v. Shell Oil Co.,* 661 F.2d 378 (5th Cir. 1981); *Smith v. United States,* 980 F.2d 1379 (11th Cir. 1993)). Accordingly, the Dravo parties request that Price's motion for summary judgment be denied.

In reply to the opposition to its summary judgment motion, Price counters with three arguments. First, Price submits that the evidence of record does not show that Barge DM-1878 was fleeted prior to Butcher's accident or moved with Price's own tug. Indeed, Price submits that the more typical procedure was for a third-party towing company to bring a loaded barge directly to Price's docking and unloading area and then pick up the unloaded barge from the same area. Price posits that these facts, and the fact that Price had no ownership interest in the cargo being unloaded from the barges, distinguish this case from the owners *pro hac vice* in *Blair* and *Griffith I.* Thus, Price contends it exercised significantly less control over Barge DM-1878 than the owners *pro hac vice* in *Blair* and *Griffith I.* Second, Price contends that neither Butcher nor ACL/ACBL addressed the authority it cited in its memorandum in support of summary judgment regarding *Griffith I* and

*Griffith II*, and *Blair,* nor did Butcher and ACL/ACBL address the case law distinguishing between demise charters and voyage charters, as set forth in *Aird, supra*. Price maintains that the facts it cited indicate the extremely limited control it exercised over the Barge, which clearly establishes that it was not a demise charterer, and in support, cites *Conoco, Inc. v. Skinner*, 970 F.2d 1206 (3d Cir. 1992). Finally, Price disputes that the language of the Terminaling Agreement defining Price's responsibilities establishes that it is an owner *pro hac vice*. Price contends that the facts it cites in support of its summary judgment motion clearly establish that Dravo Lime's own personnel did not expect, and therefore did not require, anywhere near the level of inspections or maintenance that Butcher and ACL/ACBL suggest the Terminaling Agreement required. Price further contends that the Terminaling Agreement actually affirmatively establishes that its handling of the barges was merely incidental to its unloading of Dravo Lime's lime, and therefore, Price's rights to control Barge DM-1878 did not rise to the level of a demise charter.

The LHWCA "establishes a comprehensive federal workers' compensation program that provides longshoremen and their families with medical, disability, and survivor benefits for work-related injuries and death." *Howlett v. Birkdale Shipping Co., S.A.,* 512 U.S. 92, 96 (1994) (citations omitted). Pursuant to Section 904 of the LHWCA, a longshoreman who is injured in the course of his employment, is entitled to workers' compensation benefits from his employer,[28] regardless of who is at fault. 33 U.S.C. § 904 (1984). In exchange for paying statutory benefits, the employer's liability for workers' compensation payments is exclusive and in place of all other liability to the longshoreman. 33 U.S.C. § 905(a) (1984); *Howlett,* 512 U.S. at 96. However, the LHWCA

---

28. Generally, a longshoreman's employer is a stevedore who is an independent contractor, as opposed to a ship owner who provides its own stevedoring operation. *Howlett,* 512 U.S. at 96 (citing *Edmonds v. Compagnie Generale Transatlantique,* 443 U.S. 256, 263-64 (1979)).

provides an exception to the exclusivity provision in Section 905(a)–where the employer is also a vessel owner.  33 U.S.C. § 905(b) (1984).

Section 905(b) authorizes a longshoreman to bring a negligence action against the vessel on which he is injured, but precludes the vessel from seeking indemnity against the stevedore employer:

> In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel. If such person was employed to provide shipbuilding, repairing, or breaking services and such person's employer was the owner, owner pro hac vice, agent, operator, or charterer of the vessel, no such action shall be permitted, in whole or in part or directly or indirectly, against the injured person's employer (in any capacity, including as the vessel's owner, owner pro hac vice, agent, operator, or charterer) or against the employees of the employer.  The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter.

33 U.S.C. § 905(b) (1984). [29]  Congress explained its reason for eliminating claims against a vessel based on strict liability (under the unseaworthiness doctrine) and the concomitant indemnity claims against the stevedore employer, as follows:

---

29.  A longshoreman cannot, however, obtain a double recovery, because the stevedore employer, by paying him compensation under the LHWCA, acquires a lien in that amount against any recovery the longshoreman may secure from the vessel.  *Jones & Laughlin Steel Corp.,* 462 U.S. at 530 n. 5 (citing *Edmonds,* 443 U.S. at 269-70).

Since the vessel's liability is to be based on its own negligence, and the vessel will no longer be liable under the seaworthiness doctrine for injuries which are really the fault of the stevedore, there is no longer any necessity for permitting the vessel to recover the damages for which it is liable to the injured worker from the stevedore or other employer of the worker. Furthermore, unless such hold-harmless, indemnity or contribution agreements are prohibited as a matter of public policy, vessels by their superior economic strength could circumvent and nullify the provision of Section 5 of the Act by requiring indemnification from a covered employer for the employee injuries. Accordingly, the bill expressly prohibits such recovery, whether based on an implied or express warranty. It is the Committee's intention to prohibit such recovery under any theory including, without limitation, theories based on contract or tort. Under the proposed amendments the vessel may not by contractual agreement or otherwise require the employer to indemnify it, in whole or in part, for such damages.

1972 U.S.C.C.A.N. at 4704-05.

According to the Supreme Court, it is clear from the second sentence of Section 905(b) that "[a separate action for negligence] is authorized against the vessel even when there is no independent stevedore and the longshoreman is employed directly by the vessel owner." *Jones & Laughlin Steel,* 462 U.S. at 530.[30] A "vessel" is defined under the LHWCA as "any vessel upon

---

30. The Supreme Court drew this inference from the following language in § 5(b): "If [a longshoreman] was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel." 33 U.S.C. § 905(b); *Jones & Laughlin Steel*, 462 U.S. at 530. The Supreme Court found support for its conclusion in the legislative history to the 1972 amendments:

> The Committee has also recognized the need for special provisions to deal with a case where a longshoreman . . . is employed directly by the vessel. . . . The Committee believes that the rights of an injured longshoreman . . . should not depend on whether he was employed directly by the vessel or by an independent contractor. Accordingly, the bill provides in the case of a longshoreman who is employed directly by the vessel there will be no action for damages if the injury was caused by the negligence of persons engaged in performing longshoring services. . . . The Committee's intent is that the same principles should apply in determining liability of the vessel which employs its own longshoremen . . . as apply when an independent contractor employes (sic) such persons.

1972 U.S.C.C.A.N. at 4705; *Jones & Laughlin Steel*, 462 U.S. at 531-32 (other citations omitted).

which or in connection with which any person entitled to benefits under [the LHWCA] suffers injury or death arising out of or in the course of his employment, and said vessel's owner, owner pro hac vice, agent, operator, charter or bare boat charterer, master, officer, or crew member." 33 U.S.C. § 902(21). Here, Butcher, ACL, ACBL and the Dravo parties allege that Price was the owner *pro hac vice* of Barge DM-1878 while the Barge was in its exclusive care, custody and control, and therefore, under the "dual capacity" doctrine, Butcher can maintain a negligence action against Price in its capacity as vessel owner, and ACL, ACBL and the Dravo parties can seek indemnity and contribution from Price.

"Under the dual capacity doctrine, an employer who normally enjoys immunity from suit because of the exclusive remedy provision of workmen's compensation law may be liable for injuries when acting in a capacity outside of the employment relationship." *Hapag-Lloyd, A.G. v. Lavino Shipping Co.,* Civ. A. No. 88-6929, 1989 WL 155921, at *1 (E.D.Pa. Dec. 21, 1989) (citing *Roach v. M/V Aqua Grace*, 857 F.2d 1575, 1579 (11th Cir. 1988)). The dual capacity doctrine is aimed primarily at shipowners who provide their own stevedoring operation, as opposed to the situation where, as here, the stevedore is an independent contractor. *DeArmond v. Southwire Co.,* No. 02-5818, 109 Fed.Appx. 722, 724, 2005 A.M.C. 593 (6th Cir. Aug. 24, 2004). In 1984, Congress amended Section 905(b), substituting the following language for the third sentence in the 1972 version:

> If such person was employed to provide shipbuilding, repairing, or breaking services and such person's employer was the owner, owner pro hac vice, agent, operator, or charterer of the vessel, no such action shall be permitted, in whole or in part or directly or indirectly, against the injured person's employer (in any capacity, including as the vessel's owner, owner pro hac vice, agent, operator, or charterer) or against the employees of the employer.

33 U.S.C. § 905(b) (1984)   By adding this language to Section 905(b), Congress effectively proscribed application of the dual capacity doctrine where the employee is providing shipbuilding, repairing or breaking services.   *Hapag-Lloyd*, 1989 WL 155921, at *4 (citing *Roach,* 857 F.2d at 1580 (citing H.R. Conf. Rep. 1027, 98ᵗʰ Cong., 2d Sess. 23, *reprinted in* 1984 U.S. Code Cong. & Admin. News 2734, 2771, 2773)).   However, because Congress did not explicitly include stevedores in the 1984 amendment to Section 905(b), the court in *Hapag-Lloyd* concluded that after the 1984 amendment, the dual capacity doctrine applies only to situations where the vessel owner is also a stevedore employer and is sued by its employee in its capacity as vessel owner.   *Id.*   In support of its conclusion, the court pointed to *dicta* by the Third Circuit, which opined that by amending Section 905(b) in 1984, Congress has now "'abolished the dual liability concept for private workers suing their employer/shipowner . . . [and] therefore, private employees are prohibited from initiating a negligence suit directly against a vessel owner.'"   *Id.* (quoting *Eagle-Picher Indus., Inc. v. United States,* 846 F.2d 888, 895 n.10 (3d Cir. 1988)).[31]

The dual capacity doctrine does not likely apply in this case for several reasons.   First, application of the dual capacity doctrine was intended mainly in situations where shipowners run their own stevedoring operations.   *DeArmond,* 109 Fed. Appx. at 724.   Moreover, in this Circuit, it

---

31.  In many of the cases cited by the parties and discussed above, the opinions of the courts have made the analysis here more difficult by using the terms, "vessel owner" or "shipowner," when referring to a shipowner who is *not* the employer, as well as to a shipowner who is also the employer, without making any distinction.  For example, the language quoted above from the Third Circuit in *Eagle-Picher* initially refers to the "employer/shipowner," but later in that sentence states more broadly that the prohibition applies to negligence suits by employees directly against a "vessel owner."  It appears that the court of appeals' latter reference to a "vessel owner" was intended to mean an employer who is also the vessel owner, otherwise, this statement directly contravenes the first sentence of Section 905(b), which authorizes an employee to bring a negligence action against a vessel owner as a third party.  It is likely that the lack of clarity as to the shipowner's status has led to much confusion in interpreting the rulings of various courts on this issue.

has been determined that "[w]here an independent stevedore rather than a vessel provides the stevedoring services, the LHWCA precludes the longshoreman and also the shipowner from suing the stevedore employer." *Hapag-Lloyd,* 1989 WL 155921, at *3 (citing *Rich v. U.S. Lines, Inc.,* 596 F.2d 541, 545-47 (3d Cir. 1979)). Second, the 1984 amendment to Section 905(b) indicates a Congressional intent to limit the use of the dual capacity doctrine under the LHWCA. *Id.* at *4 (citation omitted). Third, at least one district court in this Circuit has held that the dual capacity doctrine under the LHWCA applies only in the situation where the vessel owner is also a stevedore employer, and is sued in its capacity as vessel owner. *Id.* It is significant to note the precise holding of the court: the dual capacity doctrine applies "where the vessel owner is also the stevedore employer" and not the other way around, *i.e.,* where the stevedore employer is also an owner *pro hac vice*. That the court in *Hapag-Lloyd* intended to limit its holding to such situations is further evidenced by its explanation, that the "dual capacity doctrine does not create an exception to the LHWCA's plan for the stevedore employer's exclusive workmen's compensation liability except where a stevedore employer owns the vessel[.]" *Id.* at * 5.

In the instant matter, neither ACL nor ACBL (the vessel owner) is also the stevedore employer. Therefore, the dual capacity doctrine may not be invoked here against Price by either Butcher (vis a vis his negligence claim), or by ACL and ACBL (vis a vis their contribution/indemnity claims).

Even if the dual capacity doctrine did apply here, ACL, ACBL, and Butcher's Section 905(b) claims against Price still fail because the undisputed evidence does not establish that Price was an owner *pro hac vice* of Barge DM-1878. The term "owner *pro hac vice*" is not defined in the LHWCA. Nonetheless, the courts have provided the governing principles for making that

determination.  "A[n] owner pro hac vice is one who assumes by charter or otherwise 'exclusive possession, control, command, and navigation' of the vessel for a specified period of time." *Bernier v. Johns-Manville Sales Corp.,* 547 F.Supp. 389, 393-94 (D. Me. 1982) (quoting *Stephenson v. Star-Kist Caribe, Inc.,* 598 F.2d at 679; *Guzman v. Pichirilo,* 369 U.S. 698, 699-700 (1962); citing G. Gilmore & C. Black, Jr., *The Law of Admiralty,* 239-43 (2d ed. 1975)).  "An owner pro hac vice 'has complete– though perhaps only temporary–dominion over the vessel entrusted to him.  He commands her navigation and is entitled to avail himself fully of her services.'" *Bernier,* 547 F.Supp. at 394 (quoting *Olsen v. Todd Shipyards Corp.,* 435 F.Supp. at 571).

Such status can be achieved through a demise or bareboat charter agreement.  *Matute v. Lloyd Bermuda Lines, Ltd.,* 931 F.2d 231, 235 (3d Cir. 1991); *Bossard v. Port Allen Marine Service, Inc.,* 624 F.2d 671, 672 (5th Cir. 1980).  In *Bossard,* the court of appeals held that "[f]or [pro hac vice] ownership to be found, it is generally necessary for the defendant's relationship to be that of shipowner-bareboat charterer.  Such a relationship is materially different from that of shipowner-ship repairer or shipowner-stevedore."  624 F.2d at 672  (citing *Rao,* 467 F.2d at 1277).  "'[T]he charterer takes over the ship, lock, stock and barrel, and mans her with his own people.  He becomes . . . the owner pro hac vice, just as does the lessee of a house and lot, to whom the demise charterer is analogous.'" *Id.* at 672-73 (quoting G. Gilmore & C. Black, *The Law of Admiralty,* § 4-1 at 194 (2d ed. 1975); and citing *Eskine v. United Barge Co.,* 484 F.2d 1194, 1196 (5th Cir. 1973)).  "Though the ship repairer is a bailee, and to that extent is like a charterer, he plainly does not have the degree of control over the vessel that the charterer, the owner pro hac vice, has." *Id.* at 673.  Thus, in order for a demise charter to exist, "the owner of the vessel must completely and exclusively relinquish 'possession, command, and navigation' [of the vessel] to the demisee.  It is therefore tantamount to,

though just short of, an outright transfer of ownership. However, anything short of such a complete transfer is a time or voyage charter party or not a charter party at all."[32] *Guzman*, 369 U.S. at 699-700 (citations omitted).

In *Matute,* the court of appeals found that the contractual relationship between the shipowner and charterer was a time charter in name and in fact. 931 F.2d at 235. In that Jones Act case, the court of appeals noted a hesitancy by the courts to "imply a relinquishment of possession and control *by the [ship] owner* . . . absent the most explicit language indicating that the owner completely and exclusively gives up 'possession, command, and navigation' of the vessel to the charterer." *Id.* (citing *Guzman,* 369 U.S. at 699) (emphasis added). The court of appeals found no such evidence in the "Time Charter" between the parties.

Similarly here, the undisputed facts reveal that there was no relinquishment or transfer of ownership rights from ACBL to Price, let alone a complete relinquishment or transfer of ownership rights. The Transportation Agreement and Contract of Affreightment were executed by National Marine/ACBL and Dravo Lime; Price was not a party to those agreements. In addition, the Terminaling Agreement was between Dravo Lime and Price, not between ACBL and Price, and therefore, ACBL would not have had any part in negotiating that agreement.[33] Further, even if

---

32. "[A] time or voyage charterer contracts not for the vessel itself but for a specific service of the vessel, such as carriage of goods, which is rendered by the owner's master and crew. As the owner does not relinquish exclusive possession and control to the time or voyage charterer, the latter is not subject to an owner's liabilities as is the demise charterer." *Stephenson,* 598 F.2d at 679 (citing *Reed v. S.S.Yaka,* 373 U.S. 410, 412 (1963)); *see also Matute*, 931 F.2d at 235 (citing *Stephenson, supra*; *Aird*, 169 F.2d at 609-10; 95 A.L.R. Fed. 636 (1989)).

33. ACBL advances the argument that it is a third-party beneficiary of the Terminaling Agreement and, as such, seeks to invoke the indemnification clause of that agreement. For the reasons stated elsewhere in this opinion, Section 905(b) precludes claims for indemnification against stevedore employers either directly or indirectly. Thus, even if ACBL is a third-party beneficiary under the agreement, which the Court declines to decide, under Section 905(b), it is precluded from maintaining an indemnity action

ACBL could somehow argue that it relinquished and/or transferred such rights to Dravo Lime, which in turn relinquished and/or transferred them to Price, that argument cannot succeed because, as explained below, ACBL did not transfer complete ownership to Dravo Lime, and therefore, Dravo Lime was not a vessel owner or owner *pro hac vice*. Thus, the Court concludes that as a non-vessel owner, Dravo Lime could not convey to Price rights which it did not possess in the first instance.

To avoid this fatal flaw, ACL, ACBL, Butcher, and the Dravo parties attempt to hang their hats on language in the written Terminaling Agreement between Dravo Lime and Price to the effect that from the time the barges are dropped off at Price's facility until they are picked up after completion of unloading the barges, "such barges shall be deemed to be in the exclusive care, custody and control of Price," to establish that Price was the owner *pro hac vice* of Barge DM-1878. However, merely stating in a contract that a party has complete custody and control over barges in its possession, especially where the contract is between a non-vessel owner (*i.e.*, time charterer) and an independent contractor/stevedore, does not mandate *a fortiori* the conclusion that the party in possession and control of the vessel is an owner *pro hac vice*. Rather, courts must look to the entire contract between the parties and their conduct to determine the nature and extent of the possession and control intended by the parties. When the Court does so here, it is clear that neither Dravo Lime nor Price intended that Price would obtain rights commensurate with those received in a complete transfer of ownership, *i.e.,* the right to use the Barge for its own purposes in maritime commerce.[34]

against Price indirectly through Dravo Lime's contract. In other words, ACBL cannot do indirectly what it is prohibited from doing directly.

34. Although some of the parties assert that material issues of fact exist as to whether Price is an owner *pro hac vice*, the Court finds that the material facts are known and not disputed. In actuality, the parties dispute the legal conclusion that should be drawn from applying the law to the undisputed facts.

Indeed, a close examination of the language of the Terminaling Agreement reveals that Price had no ability to navigate the barges beyond its terminaling facility, or utilize any of the barges for its own commercial use. Rather, Price's use of the barges was limited to receiving and unloading them, shifting them and placing them for pick-up. (Term. Agmt., Art. II.) In addition, none of the other provisions of the Terminaling Agreement give Price rights commensurate with a complete transfer of ownership. Price's responsibilities vis a vis maintenance and inspection were incidental to its stevedore functions; ultimate control over these functions remained with Dravo Lime.[35] Additionally, Dravo Lime specifically agrees to keep the lime barges in seaworthy condition (Art. 18, § (b)(2)), a responsibility that is indicative of ownership, but is retained by Dravo Lime.

Further, the fact that Price agreed to assume sole responsibility for operation of the facility and employment of necessary personnel, and to maintain and repair all equipment and facilities required to meet its obligations under the Agreement, is not indicative of ownership, when viewed in the context of the entire Agreement. The terminaling facilities operated by Price had the capacity to receive, unload and ship out by truck between 138,000 to 300,000 tons of Dravo Lime's lime product annually. (Art. I, § (b).) The obligations in Article Four refer to Price's operation of its terminaling facilities, and its agreement to employ sufficient workers to operate its terminaling facilities and equipment related thereto. Thus, the obligations described in Article Four clearly

---

35. Price's responsibility under the Agreement vis a vis maintenance on the lime barges was minimal and limited to cleaning, sweeping and disposing of lime spilled onto the working surfaces of each barge after unloading. (Art. II, § (h).) As to inspections, Price's responsibilities were limited to visual inspection of the barges, barge covers, and lime product and reporting any damage to Dravo Lime. (Art. III.) Dravo Lime also retained control over the amount of lime left in barges, the method of removing the lime from the barges, and determining the weight of the removed lime. (*Id.*)

relate to Price's stevedore operations and have nothing to do with commercial navigation of barges.[36]

Also of no consequence is the provision requiring Price to comply with U.S. Coast Guard regulations regarding adequate mooring with warning lights. These regulations apply to vessels irrespective of who has custody of them, *i.e.,* the vessels' owner or bailees alike.[37] Thus, merely complying with the regulations is not determinative of ownership *pro hac vice*.

Finally, the Court notes that other evidence in the record shows that Price's towboat, operated by its employees, was used to move the lime barges *between its fleeting and unloading areas,* after being dropped off by Dravo Lime's towing contractor.[38] However, this movement was incidental to Price's stevedoring operations and did not rise to the level of complete possession, command and navigation of the barges required for finding ownership *pro hac vice*.[39] *DeArmond,* 109 Fed.Appx. at 724 (citing *Ducote,* 678 F.2d at 546).

Accordingly, the Court concludes that based on the material undisputed evidence of record, ACL, ACBL, Butcher and the Dravo parties have failed to establish that Price was an owner *pro hac*

---

36. This construction of Art. IV is consistent with the other provisions of the Terminaling Agreement, as well as other evidence in the record, such as testimony of John Wicker, Robert Carter, Renee Tracanna, and John Buchanan, to the effect that ACBL determined what repairs and/or maintenance were required on its barges and when they would be made, and C&C Marine performed all maintenance and repairs of barges and barge covers at the request and approval of ACBL. Also, the parties have stipulated that Price did not have any employees dedicated solely to perform maintenance on barges, but it would resolve minor maintenance problems.

37. Indeed, Robert Pennock of Price testified that Price's practice of placing mooring lights on barges was done to comply with U.S. Coast Guard regulations, which had been followed prior to its arrangement with Dravo Lime. (Pennock Dep. at 46.)

38. *See, e.g.,* Pennock Dep. at 55.

39. For example, Robert Pennock of Price stated that his understanding was that Price did not have the authority to use Barge DM-1878 for its own purposes out in the river or to remove it from Price's harbor area. (Pennock Dep. at 55-56.) John Wicker, ACBL's employee, also testified that Price could not have used Barge DM-1878 for its own purposes during 1999, as that Barge was dedicated to Dravo Lime, as the agreement would have been between ACBL and Dravo Lime. (Second Wicker Dep. at 42.)

*vice* of Barge DM-1878.[40]

The decision of the court of appeals in *DeArmond* supports this conclusion. In *DeArmond*, the court of appeals declined to find that under the dual capacity doctrine, an employer was also the owner *pro hac vice*. In that case, the operator of an aluminum smelter employed longshoremen to unload raw materials needed in its smelting process which were delivered to its river terminal by barge.[41] When the barges arrived at the smelter operator's facility, they were tied to a drop-off cell approximately 30 to 40 feet from the terminal, and remained there until the smelter operator's tugboat moved them into place at the dock. Once there, the cargo was suctioned out of the barge with a vacuum unloader and deposited onto a conveyor belt running into the smelter. A longshoreman employed by the smelter operator was fatally injured while unloading one of the barges positioned at the dock. The longshoreman's estate brought suit against the smelter operator as a vessel owner *pro hac vice* under Section 905(b). The district court initially ruled that the smelter operator was not an owner *pro hac vice*, but inexplicably reversed this ruling after a hearing on the summary judgment motion. On appeal, the court of appeals held the district court's first ruling was correct, and noted the following factual findings of the district court which supported that

40. This Court's conclusion is not altered by Price's admission that, at the time of the accident, it exercised complete custody and control over the Barge. (Doc. Nos. 75 & 91, ¶ 74.) That admission merely mimics the language in the Terminaling Agreement between Dravo Lime and Price, and does not prove, in and of itself, that Price was the owner *pro hac vice* of Barge DM-1878, for the reasons set forth above.

41. Unlike the present case, the barge company in *DeArmond* (also ACBL) had a contract directly with the longshoreman's employer (the smelter operator) for delivery of the cargo. That contract specifically provided that it was not to be construed as a demise or bareboat charter, and that the smelter operator was not permitted to exercise any control over ACBL's barges, towboats, other equipment or agents/employees. 109 Fed.Appx. at 726. These provisions were not included in the Terminaling Agreement between Dravo Lime and Price most likely because neither was the actual owner or demise charterer of the barges.

ruling:

> [The smelter operator]'s dominion over the barge was limited, contractually and factually, to the narrow sphere of unloading [the raw materials] from the barge. [The smelter operator] was not authorized to use the barge for any other purpose than moving it to and from the dock and unloading raw materials. [The smelter operator] had no right to utilize the barge for any other service that would qualify as being "tantamount to, though just short of, an outright transfer of ownership." [The smelter operator] could not take the barge any farther tha[n] the confines of its dock area. Furthermore, [the smelter operator] could not load the barge with anything else that it may have needed to transport.
>
> Given that "courts are reluctant to find a demise when the dealings between the parties are consistent with any lesser relationship," *Olsen,* 435 F.Supp. at 570, the Court concludes that [the smelter operator] did not have the "ability" to use the barge in its commercial enterprise other tha[n] the ability to use it as the contract provided. Such use was very limited and far less tha[n] one would enjoy if granted complete and exclusive possession and control just short of an outright transfer of ownership.

109 Fed. Appx. at 726 (quoting from district court opinion in that case).

In concluding that the smelter operator was not an owner *pro hac vice*, the court of appeals in *DeArmond* opined that the case law generally holds that "those who exercise control over a vessel for a particular purpose such as repairing, cleaning or unloading are not considered to be owners pro hac vice." *Id.* at 725. The court of appeals went on to explain that "[t]his is so because they have not been granted complete dominion and control over the vessel. Although they control, command and navigate the vessel while it is in their possession to accomplish the designated task, the owner of the vessel has not relinquished complete dominion and control of the vessel tantamount to a demise of the vessel. '[A]nything short of such a complete transfer is a time or voyage charter party or not a charter party at all." *Id.* (quoting *Olsen*, 435 F.Supp. at 570 (citing *Guzman,* 369 U.S. at 699-700). Thus, where the controlled movements of the barge were simply incidental to the

unloading of the vessel, ownership *pro hac vice* will be found lacking. *Id.* (citing *Ducote,* 678 F.2d at 546). In such cases, the pivotal inquiry is whether the terminal operator had the right to use the barge for its own purposes in maritime commerce. *Id.*

*Ducote* and *Keller v. United States,* 557 F.Supp. 1218 (D.N.H. 1983)*,* further support the Court's conclusion here. In *Ducote,* the court of appeals rejected the plaintiff-employee's argument that his employer was an owner *pro hac vice* under a similar fact pattern. In that case, the plaintiff had been injured when he fell off a ladder negligently erected on a barge which had been brought to his employer's terminal for cleaning. The plaintiff argued that his employer had the "care, custody and control" of the barge while it moved the barge to its dock, and cleaned and loaded the barge with new cargo. The court of appeals concluded that the employer was no more than a bailee of the barge because the employer could not use the barge for its own purposes, its custody of the barge was for the limited purposes described above, and all movements of the barge were "simply incidental to the cleaning and loading of the vessel." *Ducote,* 678 F.2d at 545-46. In so holding, the *Ducote* court distinguished the Third Circuit's decision in *Griffith II,* a case relied upon by Butcher and ACL/ACBL, based on the fact that the barge had been incorporated into the defendant's own fleet of coal barges and put to commercial use. *Ducote,* 678 F.2d at 546 n.2.

In *Keller,* a longshoreman was seriously injured while working aboard a vessel owned by the United States, which was loading cable at his employer's riverside facility, when he fell from a ladder in a cargo hold of the vessel. The longshoreman sued his employer under Section 905(b) for negligence, among other things, as owner *pro hac vice* of the vessel. Although a formal or written charter agreement did not exist in that case, the district court examined the circumstances concerning the actual possession and use of the vessel to see if ownership *pro hac vice* could be

implied. *Id.* at 1227. The district court found that longshoremen employees of the cable company were allowed on the vessel for the limited purpose of storing the cable purchased by the vessel owner in the vessel's holds and performing other tasks incidental to storing the cable, and such limitations were not consistent with ownership *pro hac vice*. *Id.* at 1228. The court also examined the nature and extent of the movement of the vessel by the employer's longshoremen. The court rejected the employee's argument that the employer used the vessel for its own commercial purposes by using it as a floating warehouse for cable already purchased by the United States. The court noted that the United States dropped the vessel off at the mouth of the harbor where a towing contractor (not owned or hired by the employer) provided towboats at the request of the employer to tow the vessel to the facility. The tugboats shifted the vessel many times between her river mooring and the pier, and eventually brought the fully loaded vessel to the mouth of the harbor where she was towed away by the United States. The employer had no authority to hire the towing contractor to move the vessel for any purposes other than those related to the cable loading operations. Under such restrictions of command, the court concluded that a demise charter did not exist. *Id.* at 1229. The court further found that the employer likewise exercised only limited control over navigation of the vessel, in that the only movements of the vessel were back and forth between the employer's river mooring and it's loading pier, a distance of approximately 400 feet. Consequently, the court concluded that such limited navigation did not constitute the control required as a matter of law to establish ownership *pro hac vice*. *Id.* at 1229-30

In the case at bar, Price's command and navigation of the barges was similarly restricted in both the Terminaling Agreement and in its actual exercise of its responsibilities under that Agreement. Accordingly, the requisite control over command and navigation of Barge DM-1878

was lacking such that ACL, ACBL, Butcher, and the Dravo parties have failed to establish, as a matter of law, that Price was an owner *pro hac vice* of the Barge. [42]

Even if the Court was to find that Price was an owner *pro hac vice* of Barge DM-1878, neither ACL nor ACBL, as a vessel owner, is entitled to indemnity and/or contribution from Price. Although an injured longshoreman may bring a claim under the dual capacity doctrine against a vessel owner who is also the stevedore employer, that doctrine does not allow the shipowner to seek indemnification in turn from the stevedore employer. *Hapag-Lloyd,* 1989 WL 155921, at *5. Section 905(b) prohibits any attempt by the *shipowner* to enforce an indemnification agreement against the stevedore employer, and any agreements to the contrary are void under the LHWCA. *Id.* (citing *Rich,* 596 F.2d at 545 n. 6). As the district court explained, the "LHWCA prohibits a shipowner from holding a stevedore employer directly or indirectly liable for a longshoreman's injuries." *Id.* at *3 (citing *Edmonds,* 443 U.S. at 263, 270). Therefore, an indemnification claim against an employer, whether in contract or tort, will be permitted only where the party seeking recovery is not a vessel owner. *Id.* (citing *Tran v. Manitowoc Eng'g Co.,* 767 F.2d 223, 229 (5th Cir. 1985); *Pippen v. Shell Oil Co.,* 661 F.2d 378, 386-88 (5th Cir. 1981); *Zapico v. Bucyrus-Erie Co.,* 579 F.2d 714, 719-23 (2d Cir. 1978)) (other citations omitted). Because ACL and ACBL are vessel owners, they are precluded from seeking indemnification from Price under Section 905(b).

### The Dravo Parties' Indemnity Claim Against Price

---

42. The Court is not persuaded by the cases cited by ACL, ACBL, Butcher and the Dravo parties in support of their assertion that Price was an owner *pro hac vice* of Barge DM-1878, as those cases are all distinguishable on their facts. For example, *Blair* predated the 1972 amendments to the LHWCA, and both *Blair* and *Griffith* involved contracts directly between the actual owners of the vessels and the stevedore employers. Moreover, in both of these cases, the facts establishing ownership were not provided in any detail, thereby precluding this Court from comparing the evidentiary basis in those cases from the evidence in the case at bar.

Although the LHWCA bars indemnity claims by vessel owners, the courts have held that such prohibition is not extended to non-vessel owners. *Hapag-Lloyd,* 1989 WL 155921, at * 3 (citing *Tran v. Manitowoc Engineering Co.*, 767 F.2d 223, 229 (5th Cir.1985); *Pippen*, 661 F.2d at 386-88; *Zapico v. Bucyrus-Erie Co.*, 579 F.2d 714, 719-23 (2d Cir.1978); *Inland Oil & Transp. Co. v. City of Mount Vernon*, 624 F.Supp. 122, 124-25 (S.D.Ind.1985); *Holden v. Placid Oil Co.*, 473 F.Supp. 1097, 1099 (E.D.La.1979); *Aetna Cas. & Sur. Co. v. Cooper Stevedoring Co., Inc.*, 504 So.2d 215, 217 (Ala.1986)). Therefore, if Dravo Lime and Dravo Corp. are determined to be non-vessels, then they are not precluded by Section 905(b) from attempting to enforce the indemnification provision in the Terminaling Agreement. The Court will address the status of Dravo Lime and Dravo Corp. as owners *pro hac vice* in turn below.

The parties dispute whether Dravo Lime should be deemed an owner *pro hac vice*, and thus, a vessel owner. If Dravo Lime is deemed to be a vessel owner, then, like ACL and ACBL, it would be precluded from seeking indemnity from Price. To make this determination, the Court turns initially to the Transportation Agreement and Contract of Affreightment between ACBL and Dravo Lime. The provisions of the these two agreements clearly demonstrate that Dravo Lime is not an owner *pro hac vice*. Under those agreements, neither National Marine nor ACBL relinquished complete and exclusive possession, command and navigation of the barges to Dravo Lime. Under both agreements, the carrier or its tug controlled the movement of the barges in all respects, including the routes taken; the carrier determined which barges were used for transportation and imposed restrictions on cargo for safe transport and safe berthing during the loading and unloading of cargo. Once the barges were delivered to Neale's Towing, Dravo Lime was not involved in the coordination of either the delivery of the loaded barges to Price's facility or the return of the empty

barges to Neale's. In addition to the agreements, the record shows that ACBL provided the crew necessary to transport barges to destinations requested by Dravo Lime. Moreover, Dravo Lime, described in the agreements as either the "customer" or "shipper," was delegated sole responsibility and control over loading and unloading berths and all personnel and equipment necessary to effectuate proper loading and unloading of cargo at its facilities, neither of which constitutes exclusive possession, command and navigation of the barges.

The Contract of Affreightment further provides that the barges used to transport Dravo Lime's cargo "are owned, chartered or controlled by ACBL," and requires compliance with all U.S. Coast Guard regulations while the barges are in the "care and custody" of Dravo Lime, or its agent, including adequately mooring the barges at the loading and unloading points with warning lights properly displayed. What is significant about the latter requirement is the use of the words "care and custody" to describe Dravo Lime's or its agent's relationship to the barges, which suggests that something less than complete and exclusive possession, command and navigation was relinquished to Dravo Lime or its agent. Also, a party's compliance with the U.S. Coast Guard regulations for mooring vessels in their possession does not alone establish that such party has such complete and exclusive possession, command and navigation of the barges as that required to be deemed an owner *pro hac vice*.

It is clear that the Contract of Affreightment here fits the definition of a time charter–the charterer (Dravo Lime), engages for a fixed period of time vessels (barges), which remain manned and navigated by the vessel owner (ACL/ACBL), who retains possession and control, to carry cargo to the destinations specified by Dravo Lime. Schoenbaum, *2 Admiralty & Mar. Law § 11-1*. As noted earlier, time charters generally do not possess the complete and exclusive possession,

command and navigation over the vessels needed to create ownership *pro hac vice*. *See* note 32, *supra.* Moreover, the parties do not point to any other evidence in the record to indicate that the agreement between National Marine/ACBL and Dravo Lime was anything other than a time charter. Accordingly, the Court finds that Dravo Lime was not an owner *pro hac vice* of Barge DM-1878 at the time of the accident. As a non-vessel owner, Dravo Lime is not precluded by Section 905(b) from bringing a claim for indemnity/contribution against Price.

Whether Dravo Lime is actually entitled to recover from Price on its indemnity/contribution claim cannot be determined on summary judgment. The Terminaling Agreement imposes a condition precedent to Dravo Lime's receipt of indemnity from Price–that the liability for which Dravo Lime seeks indemnification must not have been caused by the sole negligence of Dravo Lime, its agents, servants or employees. Dravo Lime bears the burden of proof on this issue at trial, but has not pointed to any evidence in the record to show that it has met its burden. Moreover, the Court finds that material issues of fact exist as to whether the accident and subsequent injuries allegedly sustained by Butcher were caused by the sole negligence of Dravo Lime, its agents, servants or employees. Therefore, Dravo Lime's cross-motion for summary judgment on this issue will be denied.

Turning now to Dravo Corp., it is clear that Dravo Corp. is also not a vessel owner, as it was the manufacturer of Barge DM-1878, and sold the Barge in 1977. Therefore, while Section 905(b) does not preclude Dravo Corp. from bringing an indemnity action against Price, any such recovery will depend upon it proving that: (1) it is an "affiliate" of Dravo Lime; and (2) that the liability for which Dravo Lime seeks indemnification must not have been caused by the sole negligence of Dravo Lime, its agents, servants or employees. Dravo Corp. points to no evidence in the record that

44

establishes it has satisfied its burden on the first point–that it is an affiliate of Dravo Lime. As to the second point, similar to Dravo Lime, material issues of fact exist as to whether the accident and subsequent injuries allegedly sustained by Butcher were caused by the sole negligence of Dravo Lime, its agents, servants or employees. Therefore, Dravo Corp.'s cross-motion for summary judgment on this issue will likewise be denied.

### B. ACL/ACBL's Motion for Summary Judgment and Dravo Parties' Counter Motion for Summary Judgment

ACL/ACBL move for summary judgment in their favor on the negligence claims asserted against them by Butcher and Dravo Corp.,[43] and on ACBL's claims for contractual indemnity against Dravo Lime and Price.

With regard to the negligence claims against them as owner and/or charterer of Barge DM-1878, ACL/ACBL submit that Butcher and Dravo Corp. bear the burden of proving that the vessel was negligently maintained or repaired and that such negligence was the cause of Butcher's injuries. Although it is alleged in the negligence claims brought by Butcher and Dravo Corp. that the Barge was defective, that ACL/ACBL negligently repaired and/or maintained an allegedly defective pad-eye on the Barge, and/or ACL/ACBL failed to inspect or warn in regard to the allegedly defective pad-eye, in connection with a maritime accident in which Butcher sustained personal injuries, ACL/ACBL argue that none of the parties has developed any evidence through discovery to establish that the pad-eye was in a defective condition prior to the time of the accident, or that even if the pad-eye was defective, that ACL/ACBL knew or could have known of any such defect, or that they were negligent in the maintenance and/or repair of the pad-eye, or that they failed to properly

---

43. The Court notes that ACL/ACBL's complaint in Civ.A. 01-1505 also includes a negligence claim.

inspect and warn. Consequently, ACL/ACBL submit that the negligence claims against them should be dismissed.

In addition, ACBL moves for summary judgment on its contractual indemnity claim against Dravo Lime in Civil Action No. 02-1157 and Price in Civil Action No. 01-1357. In support thereof, ACBL submits that Dravo Lime and/or Price, in their capacities as owners *pro hac vice*, negligently failed to properly inspect, maintain, repair and operate the Barge, caused an unsafe or defective condition of the Barge, failed to provide seaworthy vessels, and breached, among other duties, their turnover duty/duty to warn, the active operations duty, and/or the duty to intervene relative to Butcher.[44] ACBL further submits that the evidence shows Dravo Lime and Price had contractual obligations to indemnify ACBL pursuant to the Transportation Agreement (which was incorporated into the Contract of Affreightment) and the Terminaling Agreement. Therefore, ACBL maintains, it is entitled to summary judgment on its indemnity claims against Dravo Lime and Price.

Finally, the Dravo parties filed a counter motion for summary judgment against ACL/ACBL on two claims. First, Dravo Lime asserts that under the Contract of Affreightment, ACBL was required to provide suitable covered barges for the transportation of lime. As Barge DM-1878 was not suitable for the shipment of lime, ACBL breached its contract with Dravo Lime and therefore is liable for the defective condition of the Barge. Accordingly, Dravo Lime requests judgment in its favor and against ACBL on the issue of ACBL's liability for the defective condition of the Barge base upon breach of contract. Second, Dravo Lime seeks summary judgment in its favor on ACBL's claim for contractual indemnity against it. Dravo Lime contends that the Transportation Agreement

---

44. The Court determined earlier in this opinion that neither Dravo Lime nor Price are owners *pro hac vice*. Therefore, since they are not shipowners, none of the *Scindia* duties is even implicated with regard to either Dravo Lime or Price. *See* discussion *infra* beginning at page 47 regarding the *Scindia* duties.

is superseded by the Contract of Affreightment as a matter of law, and under the Contract of Affreightment, ACBL is not entitled to contractual indemnity with regard to incidents involving the unloading of the barges. Consequently, Dravo Lime requests summary judgment in its favor on ACBL's claim for contractual indemnity.

## 1.    Negligence Claims Against ACL/ACBL

When Congress amended Section 5(b) of the LHWCA in 1972, it eliminated a shipowner's liability based on unseaworthiness and instead provided a cause of action against a vessel for injuries to longshoremen caused by the negligence of the vessel. H.R. Rep. No. 92-1441, 1972 U.S.C.C.A.N. at 4703. In doing so, Congress did not specify what acts or omissions would constitute negligence on the part of the vessel, and instead, left the contours of a vessel's duty to longshoremen to be determined through the "application of accepted principles of tort law and the ordinary process of litigation." *Scindia,* 451 U.S. at 165-66. The seminal case on the duties owed by a vessel to longshoremen is *Scindia Steam Navigation Co.,* in which the Supreme Court delineated three such duties: (1) the "turnover" duty; (2) the "active operations" duty,[45] and (3) the "intervention" duty.[46] *Howlett*, 512 U.S. at 98 (citing *Scindia,* 451 U.S. at 167-78). The only duty implicated in the case at bar is the turnover duty.

The turnover duty, which relates to the condition of the ship at the commencement of the stevedoring operations, has been described by the Supreme Court as follows:

---

45. The "active-operations" duty applies once the stevedoring operations have commenced. *Howlett,* 512 U.S. at 98 (citing *Scindia,* 451 U.S. at 167). That duty requires a shipowner to "exercise reasonable care to prevent injuries to longshoremen in areas that remain under the 'active control of the vessel.'" *Id.* None of the parties here asserts that ACL/ACBL possessed active control of the vessel at the time of Butcher's accident.

46. The "duty to intervene" relates to the "vessel's obligations with regard to cargo operations in areas under the principal control of the independent stevedore." *Id.* (citing *Scindia, id.* at 167-78).

> A vessel must "exercise ordinary care under the circumstances" to turn over the ship and its equipment and appliances "in such condition that an expert and experienced stevedoring contractor, mindful of the dangers he should reasonably expect to encounter, arising from the hazards of the ship's service or otherwise, will be able by the exercise of ordinary care" to carry on cargo operations "with reasonable safety to persons and property."

*Id.* (quoting *Fed. Marine Terminals, Inc. v. Burnside Shipping Co.,* 394 U.S. 404, 416-17 n. 18 (1969); citing *Scindia,* 451 U.S. at 167). Reasonable care under the circumstances will result in a finding of negligence where the injured longshoreman establishes:

> (1) that the vessel knew of or by the exercise of reasonable care could have discovered the condition on board ship that led to the injury; (2) that the vessel knew or should have known that the condition would pose an unreasonable risk of harm to longshoremen working on board ship; and (3) that the vessel failed to exercise reasonable care to protect the longshoremen against that danger.

*Griffith II,* 610 F.2d at 126.[47] (citing *De Los Santos v. Scindia Steam Navigation Co., Ltd.,* 598 F.2d 480, 485 (9th Cir. 1979)[48]). The Supreme Court also noted a corollary to the turnover duty–the duty to warn, which

> requires the vessel to warn the stevedore "of any hazards on the ship or with respect to its equipment," so long as the hazards "are known to the vessel or should be known to it in the exercise of reasonable care," and "would likely be encountered by the stevedore in the course of his cargo operations[,] are not known by the stevedore[,] and would not be obvious to or anticipated by him if reasonably competent in the performance of his work."

*Howlett,* 512 U.S. at 98 (quoting *Scindia,* 451 U.S. at 167 (citing *Federal Marine,* 394 U.S. at 416 n. 18)). Consequently, a shipowner " has a duty with respect to the condition of the ship's gear,

---

47. As noted earlier, *Griffith II* was vacated and remanded for further consideration in light of the Supreme Court's decision in *Scindia,* and reinstated following remand from the Supreme Court. *See* note 23, *supra.*

48. *Aff'd,* 451 U.S. 156 (1981).

equipment, tools, and work space to be used in the stevedoring operations; and if he fails at least to warn the stevedore of hidden danger which would have been known to him in the exercise of reasonable care, he has breached his duty and is liable if his negligence causes injury to a longshoreman." *Scindia,* 451 U.S. at 167.[49]

With regard to obvious hazards, the court of appeals has held that "a shipowner can, ordinarily, reasonably rely on the stevedore (and its longshore employees) to notice obvious hazards and to take steps consistent with its expertise to avoid those hazards where practical to do so." *Kirsch v. Plovidba,* 971 F.2d 1026, 1030 (3d Cir. 1992). Under such circumstances, the shipowner will not be liable for negligence under the turnover duty. *Id.* In this circuit, the court of appeals has consistently held that the question of obviousness is generally one for the jury to decide. *Serbin v. Bora Corp., Ltd.*, 96 F.3d 66, 73 (3d Cir. 1996) (citing *Davis v. Portline Transportes Maritime Internacional,* 16 F.3d 532, 540 (3d Cir. 1994); *Kirsch,* 971 F.2d at 1030). Thus, if reasonable minds could differ as to whether the weld on the doubler/pad-eye presented an obvious danger under the facts and circumstances of this case, then summary judgment would be precluded on the issue of ACL/ACBL's negligence.

In the case at bar, Butcher contends that a genuine issue of material fact exists as to whether ACL/ACBL breached their duty to turnover the Barge in a reasonably safe condition to Price. Butcher submits that ACL/ACBL's argument to the effect that there is no evidence to support the

---

49. Where actual knowledge of a hazard is lacking, the duty to warn may arise only where the exercise of reasonable care would require the shipowner to inspect for or discover the existence of a hazard. *Howlett,* 512 U.S. at 100 (citing *Kirsch v. Plovidba,* 971 F.2d 1026, 1029 (3d Cir. 1992)). The shipowner's responsibilities to inspect the ship itself and its gear, equipment, and tools, is commensurate with its access to and control over the vessel, keeping in mind that negligence is the applicable standard where longshoremen are involved. *Id.* at 104-05.

claim that they knew or should have known that the pad-eye at issue was defective, focuses too narrowly on the pad-eye. Rather, Butcher submits that the accident occurred because Price's crew was required to close a barge cover that was well worn and past its prime usage; that there were numerous reported problems with the cover no. 1 hanging up and being hard to close; that this problem was reported to C&C and an issue of fact exists as to whether ACBL had notice of these reports; that the cover was still pulling hard on October 5, 1999, prior to the accident.[50] Butcher argues that from this, an inference can be drawn that the problem with the covers was not addressed, and that the additional stress on welded pad-eyes could result in fatigue, fractures and failure. In addition, Butcher argues that ACBL should have foreseen that Price's crew would use a method other than a central pull to close a hard to move cover, particularly since it was customary for hooks to be moved to other pad-eyes when there was a problem with closing a cover. In light of this and the knowledge that pad-eyes have come loose and separated from covers when covers were being opened or closed, Butcher thus contends that regardless of whether ACBL knew that the weld on the pad-eye at issue was likely to break on October 5, 1999, sufficient evidence exists to show that ACBL knew or should have known that an accident was going to occur due to the generally

---

50. According to Butcher, the evidence of record shows, or at least raises an issue of material fact, that ACL/ACBL knew or should have known of the complaints about the barge cover being hard to close and numerous maintenance issues with the barge covers on Barge DM-1878 in the months preceding his accident. In support, Butcher points to the testimony of Bob Carter and John Wicker; to inspection reports from Pleasant Power Station (August 8, 1999) and Maysville (August 4, 1999; August 23, 1999; September 28, 1999) in the two to three months preceding his accident; a fax dated 8/30/99 from Carter to ACBL reporting problems with covers no. 1 and 2; and to the lack of records from C&C documenting any repairs on August 17, 1999, or any other time. The Court's own review of the evidence reveals that the only documented repair by C&C was on October 20, 1997, and that did not involve any repairs to covers or doublers/pad-eyes.

deteriorating condition of the barge cover.[51]

Similarly to Butcher, the Dravo parties submit that ACL/ACBL, as shipowners, owed a duty to turnover Barge DM-1878 in a safe condition and to warn them of hazardous conditions. The Dravo parties contend that ACBL, as charterer, had control and custody of the Barge prior to its turnover to Price for unloading, and the fact that ACBL was not aware of a particular defect in the pad-eye is not important. According to the Dravo parties, what is important is that ACBL knew that Barge DM-1878's covers were in bad condition, were hard to close, and had to be serviced frequently, and that the opening and closing of the barge covers was necessary for the loading and unloading of lime. Consequently, the Dravo parties argue that ACBL knew that the defective barge covers were a hazard that would be encountered in the process of loading and unloading the lime, and therefore, ACBL breached its duty to warn Dravo Lime and Price of this hazard.

In addition, the Dravo parties contend that ACBL was contractually obligated to Dravo Lime to provide "'suitable' (or seaworthy)" barges for transporting Dravo Lime's cargo. Because the condition of the covers on Barge DM-1878 rendered them unsuitable for transporting lime, and ACBL was aware of this fact, the Dravo parties submit that ACBL is liable for breach of contract to Dravo Lime for failing to provide "suitable" barges for transporting Dravo Lime's lime. Moreover, according to the Dravo parties, any argument by ACBL to the effect that Dravo Lime

---

51. To the extent that Butcher relies on *Griffith II* in support of his argument, such reliance is misplaced. That case was on appeal after a non-jury trial and involved a different defective condition than the one implicated here–in *Griffith II*, the barge covers stuck and were difficult to move, and the wheels and track mechanism on which the covers rolled had not been lubricated and were rusty and bent. Two pad-eyes on the stuck cover were missing, requiring the stevedore's crew to attach the hook on the cable to the lip on the underside of the cover. The court of appeals in *Griffith II* affirmed the district court's finding that the evidence showed that ACBL knew or should have known of the condition to the barge covers and failed to exercise reasonable care to correct it. In addition, the issue on appeal did not involve a challenge to ACBL's actual or constructive knowledge of the defective covers, but whether the obviousness of the condition relieved it of its duty to correct the problem.

accepted the condition and seaworthiness of the barges by loading its cargo into the barges, clearly misstates the contract for two reasons. First, the Dravo parties submit that the 1999 Contract of Affreightment supersedes the Transportation Agreement, and therefore the terms of the latter agreement were not operative at the time of the accident. Second, even if the Transportation Agreement was operative, Section 17 states that the loading of the barges constitutes Dravo Lime's "acceptance of the condition and seaworthiness of the barges *for the intended cargo*." (emphasis added) The Dravo parties construe the emphasized language to mean that by loading its lime into ACBL's barges, it was only agreeing to the seaworthiness of the barges with respect to their suitability to transport the lime to its customer in a dry condition.

The Court has reviewed the record and agrees with Butcher that a material issue of fact exists as to whether ACL/ACBL breached its turnover duty to Butcher. A shipowner has a duty with respect to the condition of the barge, its covers and fixtures, including doublers/pad-eyes, used in the stevedoring operations, and is required to warn the stevedore of a hidden danger which would have been known to the shipowner if it exercised reasonable care. While it appears that the record is devoid of any *reported* problems with welds on the doublers/pad-eyes on Barge DM-1878, a question still remains as to whether the weld on the doubler/pad-eye was defective, and whether ACBL, by exercising reasonable care, could have discovered the allegedly defective weld on the doubler/pad-eye. Whether a shipowner has exercised reasonable care under the circumstances is usually a question of fact for the jury.

The record here does contain some evidence that raises a material issue of fact regarding whether the weld was defective. The record shows that after the accident, Carter, Wicker, and Pennock each inspected the cover and weld. Carter testified he observed a clean black square on

the cover where the doubler had been. Wicker stated he observed a fresh break all the way around. On the other hand, Pennock testified that, in his opinion, the weld was inferior[52] and that only a small portion of the weld had a fresh break and other parts of it had been separated for some time based on his observation of rust-colored deterioration.

In addition, the evidence in the record suggests that a defect in the weld may have been observable by visual inspection, but not without removing caked-on lime. Wicker testified that when he conducted *periodic* visual inspections of the welds, he did not scrape or chip away the caked-on lime. Wicker further testified that he relied on Dravo Lime to report any problems with the barges or their equipment to him, and also on Price to report any problems to Dravo Lime. Price conducted visual inspections of the doublers/pad-eyes, but it was not their practice to scrape away caked-on lime, nor were they expected to do so. Dravo Lime's inspection reports do not indicate the nature and extent of its inspections of the welds on the doublers/pad-eyes on Barge DM-1878. John Buchanan of C&C testified that it is C&C's practice to inspect all welds whenever a barge comes in for maintenance or repairs, which included scraping or chipping away the caked on lime with a special hammer, and should have been done on July 30, 1999 when Barge DM-1878 was in for repairs. However, C&C could not produce any documentation of the nature or extent of any repairs done on July 30, 1999, or on any of the other subsequent dates Barge DM-1878 was at C&C for maintenance or repairs prior to October 5, 1999. Giving Butcher the benefit of all reasonable inferences in his favor, this evidence raises a material question of fact as to whether ACBL's inspection was adequate under the circumstances and whether, in the exercise of reasonable care

_____

52. Pennock's opinion testimony may be admissible at trial if he can be qualified as an expert based on his work experience with welds. As the Court is without the benefit of any expert reports at this juncture, Pennock's testimony may be considered for purposes of this summary judgment motion.

in carrying out the inspection, ACBL would have discovered a defective weld.

Certainly, ACBL should have been aware of the problems with closing the covers on Barge DM-1878 prior to October 5, 1999,[53] and given the testimony that it was the custom/practice among stevedores to move the cable to a different pad-eye when they experienced trouble closing covers,[54] it is reasonable to infer that additional stress would be placed on welded doublers/pad-eyes, which may result in fatigue, fractures and failure. Under these circumstances, it is possible that a jury could conclude that reasonable care may dictate a more extensive inspection of the welds, which could have revealed any defects.

For these reasons, the Court will deny ACL/ACBL's motion for summary judgment as to the negligence claims of Butcher and Dravo Corp.

### 2. ACBL's Contractual Indemnity Claim Against Dravo Lime

In support of its summary judgment motion on its indemnity claim against Dravo Lime in

---

53. The inspection reports show that Barge DM-1878 had repeated problems with the wheels on the no. 1 and no. 2 covers, and that this problem was reported to ACBL by Carter via fax on August 30,1999, approximately one month prior to Butcher's accident. A subsequent inspection report on September 28, 1999 noted a problem with the wheel on the no. 1 cover, and on October 5th, Price employees found the covers on Barge DM-1878 were hard to open. Donald Wagner, Price's superintendent, testified that he reported to Bob Carter on October 5, 1999, prior to the accident, that the lids on the Barge were pulling hard, and that Carter was surprised to hear that because the Barge had just come back from being worked on. (Wagner Dep. at 76-77.)

54. As to custom or practice, Pennock testified that there are several ways to move barge covers on barges like DM-1878. (Pennock Dep. at 16.) He was not aware of any written standards for opening/closing barge covers, but is familiar with the methods used through his experience as a general manager with Price and traveling to numerous docks and locations where this kind of work is conducted and observed these operations. (*Id.* at 17.) He has observed other operators opening and closing barge covers in the same manner as Price, including attaching the hook to a pad-eye that was off center. (*Id.*) He has never observed a sling or Y shaped device with two straps or cables used to roll covers back and forth, and Dravo Lime never instructed him to use that kind of device. (*Id.* at 18.) This at least raises a material issue of fact as to the proximate cause of Butcher's injuries and as to comparative negligence.

Civil Action no. 02-1157, ACBL argues that the Transportation Agreement, which remained essentially unchanged when the parties executed the Contract of Affreightment, contained a broad indemnity provision that clearly encompasses the type of injury alleged by Butcher–an injury sustained during the unloading of the Barge. In particular, Paragraph 18 of the Transportation Agreement provides that Dravo Lime will provide the personnel and equipment necessary to effect proper loading and unloading of the Barge, and further warrants that all cargo would be properly loaded, stowed and secured in the Barge. Paragraph 18 further provides that Dravo Lime agrees to release, indemnify, defend and hold the Carrier (ACBL) harmless for any loss, damage, injury, death, fine or penalty resulting from any breach of such warranty, and such release and indemnity applies even to losses and injuries arising form the neglect of the Carrier, strict liability, or any unseaworthiness of the Barge. (Transp. Agmt. ¶ 18.) ACBL contends that because the indemnity provision Paragraph 18 expressly applies to the alleged neglect of the Carrier or unseaworthiness of the Barge, which ACBL denies, the indemnity provision therefore also extends to claims that ACBL proximately caused Butcher's injuries. Thus, ACBL maintains that Dravo Lime is contractually obliged to indemnify it for any damages arising out of the incident, and requests summary judgment against Dravo Lime on its indemnity claims. (Doc. No. 77 at 15-16.)

ACBL further argues that Dravo Lime and ACBL had been operating under the terms of the Transportation Agreement between Dravo Lime and National Marine, when Dravo Lime requested a reduction in the freight rates. The parties negotiated new freight rates and executed the Contract of Affreightment to memorialize the new rates. ACBL maintains, however, that it was the parties' understanding that the other aspects of their contractual relationship would remain unchanged. In support of its argument, ACBL relies on the testimony of Dravo Lime's own employee, Bob Carter.

(*Id*.)  Moreover, ACBL submits that the Contract of Affreightment does not contain an integration clause, and therefore, by its terms, does not expressly supersede the Transportation Agreement.  (*Id.* at 16 n.2.)

In response, Dravo Lime argues that the 1995 Transportation Agreement was superseded by the 1999 Contract of Affreightment which, it argues, is a complete contract on its face and covers all aspects of the legal relationship between Dravo Lime and ACBL.  Moreover, under the parole evidence rule, Dravo Lime argues that a completely integrated agreement such as the Contract of Affreightment, discharges all prior agreements to the extent that they are within its scope, citing *Mellon Bank Corp. v. First Union Real Estate Equity & Mortgage Inv.,* 951 F.2d 1399 (3d Cir. 1991).  In support of its argument that the Contract of Affreightment is a completely integrated document, Dravo Lime submits that it is clear from the face of that agreement that the parties intended it to cover their entire barge transportation agreement for the term agreed upon.  Dravo Lime further submits that the parties intended the Contract of Affreightment to replace the 1995 Transportation Agreement, as they are both two-page documents, they cover the same scope and same subject matter with little variation, and the Contract of Affreightment fails to mention or reference the Transportation Agreement or its Addendum.  According to Dravo Lime, the only relevant difference between the two agreements is that the Transportation Agreement contains broader indemnity language–requiring Dravo Lime to indemnify ACBL for incidents occurring during the loading and unloading of the barges–while the Contract of Affreightment, which addresses the subject of loading and unloading, does not contain indemnity language with respect to incidents involving loading and unloading the barges, but does contain liability and indemnity

language with respect to other aspects of the relationship.[55]

To the extent that ACBL attempts to argue that the Contract of Affreightment should be construed with the Transportation Agreement because the former does not include an integration clause, Dravo Lime responds that the absence of an integration clause is not dispositive of whether it is an integrated document for purposes of the parol evidence rule, relying on *Mellon Bank,* 951 F.2d at 1406 (citing *McGuire v. Schneider, Inc.,* 534 A.2d 115, 117 (Pa. Super.1987)). Dravo Lime also points out that the Transportation Agreement does not include an integration clause. Dravo Lime thus contends that the parole evidence rule renders the Transportation Agreement inoperative.

Finally, Dravo Lime disputes ACBL's argument that the Contract of Affreightment merely memorializes a new rate agreed upon by the parties and thus should be treated as an addendum to the Transportation Agreement. In opposing ACBL's argument, Dravo Lime points out that the Contract of Affreightment sets forth twenty-three paragraphs of terms and conditions between the carrier (ACBL) and the shipper (Dravo Lime) for the barge transportation of Quicklime. The contract and booking numbers on the Contract of Affreightment are different than those on the Transportation Agreement, and the agreements were drafted by ACBL. If the parties had intended the Contract of Affreightment to be treated only as an addendum to the Transportation Agreement to memorialize the new rate, Dravo Lime contends there would have been no need to include in the Contract of Affreightment similar contract provisions covering the same subject addressed in the Transportation Agreement. Therefore, because the Transportation Agreement is excluded by the

---

55. In the Contract of Affreightment, loading and unloading is addressed in ¶ 11; indemnity language regarding berthing is contained in ¶ 13; the liability of the carrier for loss or damage to the shipment is addressed in ¶ 19; and indemnity language regarding amounts in excess of the per ton cargo valuation in contained in ¶ 20.

parole evidence rule and the terms of the Contract of Affreightment were the only operative terms at the time of the accident, Dravo Lime submits that it is not contractually obligated to indemnify ACBL.

In its reply, ACBL counters that merely because a maritime contract may appear complete on its face, that does not establish, as a matter of law, that the contract is integrated, citing *Battery S.S. Corp. v. Refineria Panama, S.A.,* 513 F.2d 735 (2d Cir. 1975).[56] Further, ACBL asserts that Dravo Lime's argument, that the Contract of Affreightment is a fully integrated document that supersedes the Transportation Agreement under the parol evidence rule, is directly contradicted by the testimony of Bob Carter. In particular, ACBL summarizes Carter's testimony as stating that Dravo Lime and ACBL executed the Contract of Affreightment merely to reflect the agreed to reduction in the freight rate, and that Carter admitted the Contract of Affreightment did not supersede any operational aspects of parties ongoing contractual relationship. According to ACBL, the omission of an integration clause in the Contract of Affreightment was consistent with the understanding testified to by Carter. (Doc. No. 108 at 6-7; Doc. No. 109 at 14-15.) Because the

---

56. The contractual issue in *Battery Steamship* involved a time charter that was amended on three separate occasions following a collision involving the chartered vessel. The third amendment covered operations after termination of the contract period and allocation of costs and expenses and waiver of certain damage claims with regard to the collision. The Second Circuit held that a question of fact existed as to whether the original charter and subsequent amendments constituted an integrated agreement concerning potential liability for damages to the chartered vessel, based on affidavits submitted by persons involved in the negotiation of the amendment as to their intent regarding the waiver provision. 513 F.2d at 737 n.2 & 739. Because the court of appeals remanded the case on the issue of integration, it refrained from deciding whether extrinsic evidence could be considered for the purpose of clarifying the meaning of the writing. *Id.* at 740 n.5. Thus, the court of appeals' discussion of the parol evidence rule in *Battery Steamship* is really *dicta.* Therefore, *Battery Steamship* is distinguishable on its facts and is inapposite to the case at bar. (As an aside, the court of appeals indicated that on remand, the district court should follow federal maritime law on the use of extrinsic evidence to explain the meaning of a written agreement, as stated in *Lucie v. Kleen-Leen, Inc.,* 499 F.2d 220, 221 (7th Cir. 1974). *Battery Steamship,* 513 F.2d at 740 n.5. However, *Lucie* was subsequently overruled by the Seventh Circuit in *Sunstream Jet Express v. Int'l Air Serv. Co., Ltd.,* 734 F.2d 1258, 1268 (7th Cir. 1984).)

parties did not intend to change any aspect of their contract other than the freight rate, ACBL contends that Dravo Lime continued to have a contractual obligation to indemnify it under the Transportation Agreement. (Doc. No. 108 at 7.) Finally, ACBL submits that there is no direct conflict between the Transportation Agreement and the Contract of Affreightment, as the former specifically addresses indemnity while the latter is completely silent. Thus, in the absence of an integration clause or other evidence that the two written agreements conflict with respect to indemnity, ACBL maintains that there is no reason to believe Dravo Lime and ACBL intended to discard the indemnity provision when they executed the Contract of Affreightment, particularly where Carter admitted the only intended change was to the freight rate. (*Id.*)

After reviewing all the relevant evidence and the applicable law, and applying it to the facts and circumstances here, the Court concludes that Dravo Lime is entitled to summary judgment in its favor on ACBL's contractual indemnity claim.

It is well established that interpretation of a maritime contract, such as a charter party,[57] is governed by federal maritime contract law. *Sea Hunt Corp. v. O.S. Debraak Equip.*, No. Civ. A. 87-4-CMW, 1992 WL 97370, * 11 (D.Del. Apr. 30, 1992) (citing *Kermarec v. Compagnie Generale Transatlantique,* 358 U.S. 625, 628 (1959); *Denali Seafoods, Inc. v. Western Pioneer, Inc.,* 492 F.Supp. 580, 582 (W.D. Wash. 1980) (citing *Kossick v. United Fruit Co.,* 365 U.S. 731 (1961)); *Great Circle Lines, Ltd. v. Matheson & Co., Ltd.*, 681 F.2d 121, 124 (2d Cir. 1982); *see also* Thomas J. Schoenbaum, *2 Admiralty & Mar. Law § 11-1* (4th ed.). The Court notes at the outset that each agreement appears, on its face, to be a valid contract and the parties do not contend otherwise.

---

57. "The term 'charter party' actually refers to the document in which the terms and conditions of the lease of a vessel by an owner to a charterer are set out." *Great Circle Lines, Ltd. v. Matheson & Co., Ltd.*, 681 F.2d 121, 124 (2d Cir. 1982) (citing G. Gilmore & C. Black, *The Law of Admiralty,* § 4-1 (2d ed. 1975)).

Moreover, a thorough review of the four corners of both agreements reveals that the Contract of Affreightment is a comprehensive agreement that covers, with specificity, the same subject matter as that contained in the Transportation Agreement–the transportation by barge of Dravo Lime's quicklime product.[58] Thus, the Court does not view the issue here to be whether the Contract of Affreightment is a fully integrated writing, although the Court has no problem finding that it is.[59] Rather, the real issue here is whether the Contract of Affreightment, executed approximately three

---

58. The Contract of Affreightment contains most of the same provisions as the Transportation Agreement, including, for example, equipment; cargo; loading point and destination; demurrage; freight rate; volume; lay time; placements; loading and unloading; payment of freight, taxes and tolls; movement of goods; carrier liability; cleaning and acceptance; general average; and force majeure.  However, the terms of some of these provisions are different–freight rates; indemnity for loading and unloading; demurrage rates; time for filing claims; statement of applicable law regarding carrier liability; and cargo valuation.  In addition, the Contract of Affreightment contains the following provisions which do not appear in the Transportation Agreement: Notice (¶ 9); Berthing (¶ 13); Government Action (¶ 18); In-Bond Shipments (¶ 21); Confidentiality (¶ 22); and Special Provisions (¶ 23) (Attachment A - Fuel Adjustment Provision).  (Doc. No. 78, Tab A.)  Also, the Transportation Agreement contains a number of provisions that are not included in the Contract of Affreightment: Definitions (¶ 12); plural/singular words (¶ 13); savings clause (¶ 14); carrier undertaking (¶ 15); perishable/hazardous goods (¶ 16); Himilaya clause (¶ 25); superseding clause (¶ 26); forum selection clause (¶ 27); notice of acceptance of terms and conditions by performance (¶ 28); and limitation of liability clause (¶ 29).  (Doc. No. 78, Tab A.)

59. Under the Restatement (Second) of Contracts, "[a]n integrated agreement is a writing or writings constituting the final expression of one or more terms of an agreement."  Restatement (Second) of Contracts § 209(1) (1981) ("Restatement").  The Restatement further provides that "[w]here the parties reduce an agreement to a writing which in view of its completeness and specificity reasonably appears to be a complete agreement, it is taken to be an integrated agreement unless it is established by other evidence that the writing did not constitute a final expression."  *Id.* at § 209(3).  The Contract of Affreightment contains all of the essential terms of a charter party and sets forth those terms with specificity.  *See* note 58, *supra.*  The Court could find no evidence to suggest that the parties did not intend the Contract of Affreightment to be a final expression of their agreement.  Noticeably absent from the record is any testimony from persons who participated in any of the negotiations, via affidavits or depositions, leading up to the execution of the agreements.  Moreover, the Contract of Affreightment does not reference or incorporate the Transportation Agreement in any way.  The parties could have merely approved an addendum to the Transportation Agreement (as they previously had done to extend the term of the contract) covering the new freight rates, if that was the only intended change.  Instead, the parties executed a subsequent comprehensive contract, which was valid and enforceable at the time of Butcher's accident.  In light of all these circumstances, the Court finds the Contract of Affreightment is a fully integrated agreement.

and one-half years after the Transportation Agreement, modifies, rescinds and/or supersedes the Transportation Agreement.[60]

"When two parties or their privies make a new agreement that is inconsistent with terms of a previous one dealing with the same subject matter, the later agreement operates to rescind and to discharge by substitution the inconsistent parts of the earlier contract." *Bechtel Corp. v. Local 215, Laborers' Int'l Union of N. Am.,* 405 F.Supp. 370, 375 (M.D.Pa. 1975), *aff'd in relevant part,* 544 F.2d 1207, 1213 (3d Cir. 1976) (citing *Jersey Cent. Power & Light Co. v. Local Unions 327, 749, 1289, 1298, 1303, 1309 & 1314, IBEW,* 508 F.2d 687, 703 (3d Cir. 1975), *vacated on other grounds* 425 U.S. 987 (1976); 6 *Corbin on Contracts § 1296* (1962); *Restatement of Contracts § 408*).[61] Whether or not a subsequent contract is deemed to supersede an earlier one requires the Court to determine the parties' intent, and it looks to the language of the contracts themselves when they are unambiguous.[62] *Jersey Central*, 508 F.2d at 703. Moreover, in order for the Court to conclude that the parties intended the second agreement to operate as a substituted contract, the Court must find that the terms of the second contract are so inconsistent with those contained in the first one that

---

60. As noted by a distinguished authority on contract law, "[the parol evidence rule] was not designed to preclude parties from changing their minds and forming a new contract. Thus, . . . the parol evidence rule has no application to *subsequent* agreements or modifications." John E. Murray, Jr., *1-5 Murray on Contracts § 84* (2001) (footnote omitted).

61. In *Bechtel* and *Jersey Central,* which involved the interpretation of collective bargaining agreements, the courts applied principles of general contract law to resolve the dispute. *Bechtel,* 405 F.Supp. at 375; *Jersey Central*, 508 F.2d at 700. As general contract principles also apply to federal maritime contracts, the Court believes the Third Circuit would apply these same principles to maritime contracts, and therefore, sees no reason not to apply the general contract principles espoused by the courts in *Bechtel* and *Jersey Central* to the contractual dispute here.

62. Neither ACBL nor Dravo Lime submits that the contract terms regarding the existence (or not) of certain indemnity provisions are ambiguous, and the Court's own review of both agreements compels it to agree.

both contracts cannot co-exist. *Id.* (citing *6 Corbin on Contracts § 1296* (1962) ("'If the new agreement contains terms that are clearly inconsistent with the previously existing contract . . . , the fact of inconsistency is itself a sufficient indication of intent to abrogate the old and substitute the new. . . . It (the new agreement) operates as a discharge by substitution, only so far as the inconsistency extends.'")

In determining whether provisions of two contracts are inconsistent, the Third Circuit has offered the following guidance:

> We believe that the question of whether provisions of two contracts are inconsistent can only be answered on a case-by-case basis; there is no litmus test for inconsistency by which these two contracts can be judged other than a test of common sense and plain meaning. See Jersey Central, supra, 508 F.2d at 703 & n. 10. Two provisions are inconsistent where both cannot be operative at the same time.

*Bechtel,* 544 F.2d at 1212. In *Bechtel,* the court of appeals affirmed the district court's ruling that the arbitration provisions of the local and national labor agreements were fundamentally inconsistent, in that the former allowed for two exceptions–jurisdictional disputes and damage claims–while the latter allowed an exception only for jurisdictional disputes, to the otherwise all-inclusive arbitration provisions. *Id.* In addition, each agreement provided for its own superiority, adding to the conflict. *Id.* In resolving this issue, the court of appeals adopted the rule stated in section 408 of the Restatement of Contracts (1932): "A contract containing a term inconsistent with a term of an earlier contract between the same parties is interpreted as including an agreement to rescind the inconsistent term in the earlier contract." *Id.* at 1213 (citing *6 Corbin on Contracts § 1296* (1962)). Applying that rule to the case before it, the *Bechtel* court held that the provision in the later national agreement providing for arbitration of all grievances and disputes excluding jurisdictional disputes, prevailed over the inconsistent arbitration provision in the earlier local

62

agreement. *Id.*

In *Jersey Central,* the court of appeals was asked to determined whether a later conciliation agreement conflicted with a seniority system/layoff provision in the earlier collective bargaining agreement. The court of appeals ruled that no conflict existed between the two agreements with respect to the overall seniority of females and minorities for determining layoffs. 508 F.2d at 701. In so holding, the court of appeals observed that the purpose of the conciliation agreement was to increase the percentage of females and minorities among new hires. Further, the conciliation agreement contained no overall layoff procedure or seniority system, and none of the express terms of that agreement affected the layoff provisions of the CBA. Of significance, the court of appeals noted, was language in the conciliation agreement that specifically incorporated provisions in the CBA dealing with the company's seniority system. *Id.* at 702. In light of that fact and because the later conciliation agreement was silent on the issue of overall seniority, the court of appeals found the two agreements were not inconsistent and held both were fully enforceable. *Id.* (citations and footnote omitted).

Here, ACBL attempts to argue that there is no inconsistency between the two agreements, contending that the Transportation Agreement contains a provision wherein Dravo Lime agrees to indemnify it from any loss or injury resulting from Dravo Lime's negligence with regard to the proper loading and unloading of cargo, even if such loss or injury results in part from the fault or negligence of National Marine, strict liability, or the unseaworthiness of any barge, while the Contract of Affreightment is completely silent as to liability/indemnity arising from this situation. The Court notes that although the Contract of Affreightment does not contain any indemnity language with regard to loading and unloading cargo, the Contract of Affreightment does provide

indemnity language in two other provisions.  In paragraph 13, entitled "Berthing," Dravo Lime agrees to indemnify and hold ACBL harmless from any and all responsibility and liability for Dravo Lime's acts or omissions in compliance with the U.S. Coast Guard's berthing requirements while barges are in the care and custody of Dravo Lime.  In paragraph 20, entitled "Cargo Valuation," the parties agree that ACBL shall not be liable for and Dravo Lime agrees to release, indemnify and hold harmless ACBL, its subcontractors, affiliates and the vessels employed by it or them, in the performance of cargo movements for any loss of or damage to or expense in connection with any article shipped in excess of a certain calculated amount.  In addition, as noted earlier, there are a number of other differences between the two agreements.[63]

The contract provisions at issue here differ from those in *Bechtel* in that the indemnity provisions are not contained in one paragraph, but are set forth in different paragraphs throughout the agreements in conjunction with other rights and responsibilities.  Therefore, the Court cannot merely look at the provision in each agreement regarding loading and unloading cargo, but must look at the totality of the agreements to ascertain the extent of Dravo Lime's obligation to indemnify ACBL.  When the Court does so, it is clear that the two agreements are fundamentally inconsistent as to indemnity.  Under the Transportation Agreement, Dravo Lime's obligation to indemnify ACBL is expanded to potentially include any losses, damages, injuries, death, etc. arising from breach of its warranties vis a vis loading, unloading and stowing cargo, irrespective of any negligence on the part of ACBL, strict liability, or the unseaworthiness of a barge/vessel.[64]  Under the later Contract

---

63.  That the later Contract of Affreightment contains terms that are inconsistent with the provisions of the Transportation Agreement, in and of itself, indicates an intent to abrogate the Transportation Agreement, at least to the extent of the inconsistency.  *Corbin* at § 1296.

64.  In addition to this indemnity clause, the Transportation Agreement also includes an indemnity provision in paragraph 16 relating to any loss, damage, injury, death, fine or penalty arising from or

of Affreightment, Dravo Lime's obligation to indemnify ACBL arises in only two situations–(1) with regard to Dravo Lime's acts or omissions in compliance with berthing requirements, and (2) with regard to cargo movements for losses/damages in excess of the per ton cargo valuation. If the Contract of Affreightment had not included any provisions at all regarding indemnification, then ACBL's argument might have some merit. However, the parties did address indemnification in the subsequent Contract of Affreightment. Therefore, unlike *Jersey Central,* the Contract of Affreightment is not completely silent on indemnification. Also unlike *Jersey Central,* the Contract of Affreightment does not contain language incorporating the indemnity provision of the Transportation Agreement, or any other provision of the Transportation Agreement, for that matter.

The Court is not persuaded by ACBL's argument that Carter's testimony supports the conclusion that the parties did not intend that the Contract of Affreightment would supersede the Transportation Agreement on any aspect other than freight rates. The relevant portion of Bob Carter's testimony is as follows:

> Q.   Do you remember if [the Transportation Agreement] was assigned subsumed, modified–In light of [the Contract of Affreightment] what happened with this agreement, do you know, if anything?
>
> A.   I do not remember. I don't remember the pricing other than that National Marine continued to make the move for us. . . .
>
> . . .
>
> Q:   If you look at [the Contract of Affreightment] it's dated March 31, 1999. . . . was [the Contract of Affreightment] in addition to–
>
> A.   I believe there would have been an assignment–What occurred to spark [the Contract of Affreightment], AEP Conesville came to us in typical fashion and said the – we're

---

connected in any way to breach of Dravo Lime's warranty that cargo shall not contain any perishable or hazardous materials or substances.

going to switch to another scrubbing agent and the price is too high. I have a certain amount of time to come up with a better deal; and so the trucker, the terminal, and the barge line did– . . . This was the agreement that ACBL came with to secure that, to hold onto the business.

Q. That was the change in price?

A. Yes, sir.

. . .

Q. Was there anything that otherwise altered [the Transportation Agreement] or indicated it would no longer be in effect?

A. I don't remember anything superseding that or canceling it. My assumption was this superseded it.

Q. Other than you, would there be anybody at Dravo Lime or Carmeuse now who could indicate whether there was another document that [the Transportation Agreement] superseded?

A. All the folks that I have reported to are essentially – have essentially moved on. Whether our general counsel would have documents to that effect, I don't know.

Q. Besides the pricing, are you aware today of anything else that changed between the parties, between ACBL and Dravo Lime, with regard to the relationship of the run, as we call it, between . . . Maysville, Kentucky, and Porterfield, Ohio?

A. Nothing operational.

Q. Just to I'm clear, your recollection was this March, '99, was triggered by a pricing change?

A. Yes, sir, to the best of my recollection, correct.

Carter Dep. at 91-93 (Doc. No. 76-3). As is clear from the above excerpt, Carter's testimony that nothing changed from an operational standpoint between Dravo Lime and ACBL after the Contract of Affreightment was signed, does not imply, as ACBL suggests, that the parties did not intend to change any aspect of their contractual relationship other than the freight rate.[65] At best, Carter's testimony can be construed to mean that from his perspective, the agreements did not differ in terms of the procedures to be followed in carrying out the day to day operations of the charter. But his

65. To argue that ACBL and Dravo Lime executed the Contract of Affreightment merely to reflect a change in the freight rate is a mis-characterization of Carter's testimony. Indeed, the plain language of the Contract of Affreightment belies this argument.

testimony can in no way be construed to mean that nothing changed in terms of the parties' legal obligations, *i.e.,* liability and indemnity provisions, under the agreements. Had Carter testified that he was involved in the negotiations surrounding either agreement, then the Court might reach a different conclusion. Or had the contract dispute here involved a provision relating to an operational term, Carter's testimony would be relevant. But that is not the case here.

Given the inconsistency between the indemnity provisions in the two agreements and the absence of any testimony regarding a contrary intent vis a vis the indemnity provisions, the Court concludes that the indemnity provisions of the two agreements cannot co-exist. Accordingly, the indemnity provisions contained in the subsequent Contract of Affreightment prevail over the indemnity provisions in the earlier Transportation Agreement. The Court therefore concludes that Dravo Lime is entitled to summary judgment in its favor on ACBL's contractual indemnity claim.

### 3.  ACBL's Contractual Indemnity Claim Against Price

As to its contractual indemnity claim against Price in Civil Action 01-1357, ACBL submits that Price is likewise obligated to indemnify it. In support, ACBL points to Article Thirteen of the Terminaling Agreement between Dravo Lime and Price, wherein Price agrees to indemnify, among others, Dravo Lime's "contractors" from any personal injury claims arising out of Price's performance. According to ACBL, the term "contractor" clearly was intended to include it, as the party who supplied the Barge and tendered it to Price for unloading. Indeed, ACBL argues that Article Eighteen of the Terminaling Agreement characterizes the party tendering the barges as the "towing contractor." Therefore, ACBL maintains that it is entitled to summary judgment in its favor on its indemnity claims against Price.

In response, Price asserts two arguments. First, Price submits that the complaint filed by

ACL/ACBL in Civil Action 01-1357 against Price does not include a claim for *contractual* indemnity, nor does it contain any references at all to any contract.[66] (Doc. No. 90 at 1.) According to Price, the first time a claim for contractual indemnity is raised is in ACL/ACBL's motion for summary judgment. Since Rule 56(a) plainly states that a party may move for summary judgment on all or part of a "claim," and no "claim" for contractual indemnity is set forth in the complaint, Price therefore maintains that no legal basis exists upon which the Court can award summary judgment to ACL/ACBL on the basis of contractual indemnity. In support of this argument, Price submits that had ACBL made a claim for contractual indemnity, Price would have conducted discovery on that claim and filed its own motion for summary judgment.[67] However, since fact discovery is closed and some of the claims have been pending since 2000, Price contends that allowing ACL/ACBL to amend their complaint at this juncture would cause it significant prejudice and impose an increased burden on the other parties and this Court.

Second, to the extent that ACBL is suggesting it is a third-party beneficiary of the Terminaling Agreement, Price submits that ACBL has failed to set forth undisputed facts establishing that is it entitled to any benefit from the Terminaling Agreement. Specifically, Price takes issue with ACL/ACBL's assertion in their brief that ACBL was a towing contractor to Dravo Lime and its conclusion, without any further support, that ACBL benefits from the terms of the Terminaling Agreement. (Doc. No. 90 at 3.) Price asserts that such a "leap" should not be made

---

66. Price admits that the complaint does include requests for indemnification as well as a claim for indemnification in count II, but asserts such requests/claim are based exclusively and expressly on tort principles. After reviewing the complaint, the Court agrees with Price that the complaint does not set forth any facts to support a claim for contractual indemnity.

67. Price asserts that at a minimum, it would have explored the meaning to the parties of the indemnity provision contained in Article 13 of the Terminaling Agreement. (Doc. No. 90 at 3.)

by either the fact finder at trial or the Court at the summary judgment stage.

In their reply brief, ACL/ACBL submit that under the liberal notice pleading standard applicable in federal courts, they were not required to plead their specific theory of recovery so long as Price received notice as to what was at issue. (Doc. No. 108 at 8-9.) ACL/ACBL further submit that when deciding whether a pleading fairly notifies a defendant of matters sought to be litigated, it is appropriate to look beyond the pleadings to the pretrial conduct and communications of the parties. (Doc. No. 108 at 9.) Because Dravo Lime has invoked the same contractual provision (Article 13 of the Terminaling Agreement) in connection with its indemnity claim against Price, which was asserted in 2001, ACBL contends that Price has been on notice since 2001 that Article 13 was at issue, and thus, Price had ample notice of ACBL's contractual indemnity claim and ample opportunity to conduct discovery as to the nature and extent of its indemnity obligation under Article 13. (*Id.*) In any event, ACL/ACBL contend that Article 13 unambiguously applies to Dravo Lime's "contractors," and it cannot be disputed that ACBL, as the party who furnished the barges to Dravo Lime pursuant to the Contract of Affreightment, is a "contractor." (*Id.*)

Even though the notice pleading requirements under Fed. R. Civ. P. 8(a) are liberal, a plaintiff must at least allege some bare minimum of facts that would support a claim for contractual indemnity. Where a plaintiff seeks to enforce a contract provision, at the very least, the complaint should contain an allegation of the existence of the contract. C. Wright & A. Miller, *5 Fed. Prac. & Proc. Civ. 3d,* § 1235 (2008); *see also GlaxoSmithKline Consumer Healthcare, L.P. v. ICL Performance Prod., LP,* No. 4:07CV2039, 2009 WL 278373, *3 (E.D.Mo. Feb. 5, 2009) (allegation in complaint that defendant agreed to indemnify plaintiff by virtue of a distributor agreement were sufficient to satisfy the pleading requirements for setting forth a claim for indemnity); *Sierra Rutile*

*Ltd. v. Katz,* No. 90 Civ. 4913 (JFK), 1996 WL 556963, *3 (S.D.N.Y. Oct. 1, 1996) (denying a motion to amend pleading to replead an indemnification claim where proposed pleading failed to plead a duty to indemnify based on the contract or even refer to the contract). Here, ACL/ACBL do not allege any facts in the complaint filed in civil action 01-1357 to suggest that ACBL will be seeking indemnity as a third-party beneficiary of the Terminaling Agreement between Dravo Lime and Price, nor do they attach a copy of the Terminaling Agreement to their complaint. However, any prejudice to Price is likely minimal, as Price was certainly aware that the contractual indemnity provision in Article 13 was at issue in the litigation between it and Dravo Lime. Moreover, there is no need to consider whether amendment of the complaint should be allowed here, as such amendment is mooted by the Court's ruling below.

Next, even if the complaint could be construed as stating a contractual indemnity claim, material issues of fact exist as to whether ACBL is an intended beneficiary under Article 13 of the Terminaling Agreement. ACBL does not cite to any evidence in the record other than the language of the Terminaling Agreement to support its argument. Further, ACBL did not include any factual statements in its concise statement of material facts in support of summary judgment, to show it was an intended beneficiary of the Terminaling Agreement. Price contends, on the other hand, that it did not have a contractual relationship with ACBL, and cites in support the deposition testimony of Wicker, Robert Price, and Pennock. (Doc. No. 72, ¶ 12.)[68] From the Court's own review of the Terminaling Agreement, it is clear that material issues of fact exist as to who is a "contractor." For

---

68. In response to Price's concise statement of material facts (Doc. No. 72, ¶ 12), ACBL denied Price's statement of fact, and countered it was a third-party beneficiary of the Terminaling Agreement as Dravo Lime's towing contractor, citing in support Articles 13 and 18 of the Terminaling Agreement. (Doc. No. 93, ¶ 12.) Thus, ACBL's own response to Price's concise statement of material facts demonstrates the existence of a material issue of fact.

example, Article 18 refers to barges tendered by Dravo Lime or its "towing contractor." The term "towing contractor" is susceptible of two meanings–it may refer to ACBL, or it may be referring to Neale's Towing, as the latter is the towing contractor who actually performed the services described in Article 18, *i.e.,* tendering and securing the barges at the unloading point and picking them up when unloading was complete. Moreover, the indemnity provision in Article 13 refers to Dravo Lime's "contractors," and it is unclear as to whether such term includes "towing contractors." Thus, the Court finds that a material issue of fact exists as to whether ACBL is a third party beneficiary of the Terminaling Agreement between Price and Dravo Lime.

In any event, ACBL's contractual indemnity claim against Price fails for another reason–ACBL's contractual indemnity claim is precluded by the Court's earlier finding that Price is not an owner *pro hac vice*. In the Court's view, by claiming third-party beneficiary status under the Terminaling Agreement, ACBL is attempting to circumvent the LHWCA's proscription on vessel owners bringing indemnity claims against stevedore employers. However, as noted above, Section 905(b) of the LHWCA precludes claims for indemnification, whether in contract or tort, by vessel owners against stevedore employers, either directly or indirectly. *Hapag-Lloyd*, 1989 WL 155921, at *3 (citations omitted); *see also* discussion, *supra,* at 41-42. Thus, even if ACBL is a third-party beneficiary under the agreement, which the Court is unable to decide on this record, under Section 905(b), ACBL is precluded from maintaining an indemnity action against Price indirectly through Dravo Lime's contract with Price. *See* 33 U.S.C. § 905(b); 1972 U.S.C.C.A.N. at 4704-05.

Therefore, regardless of whether it is a third party beneficiary under the Terminaling Agreement, ACBL cannot show that it is entitled to judgment as a matter of law on its contractual

indemnity claim against Price. Accordingly, the Court will deny ACBL's motion for summary judgment on its contractual indemnity claim against Price.

### 4. **Dravo Parties' Counter-Motion for Summary Judgment**

Finally, the Dravo parties move for summary judgment against ACL/ACBL on two claims. First, Dravo Lime requests summary judgment in its favor on the issue of ACBL's breach of its agreement with Dravo Lime to provide "suitable" barges for transporting Dravo Lime's lime, and finding ACBL liable for the defective condition of Barge DM-1878. Second, Dravo Lime seeks summary judgment in its favor on the issue of ACBL's claim for contractual indemnity under the Transportation Agreement.

As to its first claim, Dravo Lime submits that pursuant to the Contract of Affreightment, ACBL was required to provide "suitable" (or seaworthy) covered barges for transporting its lime. However, Dravo Lime maintains that the barges provided were not suitable for this purpose. In support of this argument, Dravo Lime contends that ACBL knew that the opening and closing of the barge covers was necessary for the loading and unloading of lime, and that there were repeated problems with Barge DM-1878, based on the inspection reports sent by Dravo Lime and the fact that ACBL scheduled the Barge for repairs at C&C three times just prior to the accident. Dravo Lime thus contends that the condition of the barge covers on Barge DM-1878 had rendered them unsuitable for transporting lime, and therefore, ACBL is liable to Dravo Lime for breach of contract for failing to provide "suitable" barges for transporting lime. (Doc. No. 96 at 6.)

To the extent ACBL attempts to argue that Dravo Lime accepted the condition and seaworthiness of the barges by loading its cargo into the Barge, Dravo Lime contends ACBL misstates the contract. First, Dravo Lime asserts that because the Contract of Affreightment

supersedes the Transportation Agreement, the terms of the Transportation Agreement were not operative at the time of the accident. Second, Dravo Lime contends that ACBL fails to mention the most critical language in section 17 of the Transportation Agreement–that the loading of the barges constitutes Dravo Lime's "acceptance of the condition and seaworthiness of the barges *for the intended cargo*." Dravo Lime submits that the sole reason for it conducting inspections of the barges prior to loading was to ensure that the barges were able to transport the lime to its customers in a dry condition. (Doc. No. 96 at 6-7.)

In response, ACBL counters that Dravo Lime's counter-motion for summary judgment on its cross-claim against ACBL for breach of the parties' Contract of Affreightment should be denied because the Court has already entered a default judgment against Dravo Lime that precludes such a claim. In support, ACBL asserts that it filed a Complaint for Exoneration from or Limitation of Liability in Civil Action No. 00-927 ("Exoneration Complaint") approximately nine years ago, wherein it sought, inter alia, to: (1) exonerate ACL and ACBL from any liability arising out of the incident involving Butcher; (2) in the alternative, limit any such liability to the value of the Barge and its freight; and (3) enjoin any actions against ACL and/or ACBL and/or the Barge with respect to the incident. (Doc. No. 109 at 10.) ACBL further submits that it properly served the Exoneration Complaint upon Dravo Lime, but Dravo Lime failed to file a timely claim, and Judge Ziegler subsequently entered default judgment against Dravo Lime. Therefore, ACL/ACBL maintain that Dravo Lime cannot assert a cross-claim against them for damages arising out of the incident. In support, ACL/ACBL cite *Allemand Boat Co. v. Kirk,* 979 F.2d 1533 (5th Cir. 1992). Accordingly,

ACL/ACBL submit that Dravo Lime's counter-motion for summary judgment should be denied.[69]

After reviewing the record, the Court agrees with ACL/ACBL that Dravo Lime's cross-claim for breach of contract is precluded by Judge Ziegler's order dated July 31, 2000, noting the default of Dravo Lime Corp. (Doc. No. 12-1 in C.A. No. 00-927). In entering default against Dravo Lime, Judge Ziegler found that Dravo Lime failed to file an answer or claim to the Exoneration Complaint and expressly held that Dravo Lime was barred and precluded from filing any claim against ACL/ACBL in the Exoneration proceeding or any other action or proceedings. Moreover, this Court notes that Dravo Lime has not requested, nor has it otherwise shown that it is entitled to, relief from the default judgment.[70] Therefore, since Dravo Lime's breach of contract claim against ACBL is barred by Judge Ziegler's entry of default in Civil Action No. 00-927, the Court finds Dravo Lime is not entitled to summary judgment on this claim.

With regard to Dravo Lime's request for summary judgment in its favor on the issue of ACBL's claim for contractual indemnity under the Transportation Agreement, the Court will grant said motion for the reasons set forth above in Part V.B.2.

## VI.    CONCLUSION

In summary, with regard to Price's motion for summary judgment (Doc. No. 70), the Court finds that the material facts as to Price's status as an owner *pro hac vice* are not disputed and, as a

---

69. ACL/ACBL also make an alternative argument in opposition to Dravo Lime's counter-motion for summary judgment on its cross-claim for breach of contract for allegedly failing to provide "suitable" barges. Because the Court finds merit in ACL/ACBL's first argument, the Court does not reach their alternative argument.

70. Although the record shows that Dravo Corporation sought relief from Judge Ziegler's order which was ultimately granted (Doc. No. 37), it is clear that Dravo Corporation's request for leave to file a claim nunc pro tunc (Doc. No. 26) was filed on its own behalf and did not include Dravo Lime.

matter of law, Price is not an owner *pro hac vice*. Therefore, the Court will grant Price's motion for summary judgment against ACL, ACBL and Butcher, but deny Price's motion as to the Dravo parties, based on their status as non-vessel owners. As to the Dravo parties' counter-motion for summary judgment (Doc. No. 81), the Court will deny that motion as material issues of fact exist as to whether the conditions precedent have been satisfied for the Dravo parties to obtain contribution/indemnity from Price.

With regard to ACL/ACBL's motion for summary judgment (Doc. No. 74), the Court finds that material issues of fact exist with regard to Butcher's and Dravo Corp.'s negligence claims against ACL/ACBL, and therefore, the Court will deny ACL/ACBL's motion as to the negligence claims of Butcher and the Dravo Corp. With regard to ACL/ACBL's contractual indemnity claim against Dravo Lime under the Transportation Agreement, the Court finds that, as a matter of law, the indemnity provisions in the Transportation Agreement are inconsistent with and thus superseded by the indemnity provisions in the Contract of Affreightment, and therefore, ACL/ACBL's motion for summary judgment on its contractual indemnity claim against Dravo Lime will be denied. With regard to ACL/ACBL's contractual indemnity claim against Price, as previously stated, Price is not an owner *pro hac vice*, and therefore, ACBL is precluded from seeking indemnity against Price under Section 905(b) of the LHWCA, despite any language in the Terminaling Agreement to the contrary. Accordingly, the Court will deny ACL/ACBL's motion for summary judgment as to Price. As to the Dravo parties' counter-motion for summary judgment (Doc. No. 96), the Court will deny summary judgment on Dravo Lime's claim that ACBL breached its agreement to provide "suitable" barges for transporting Dravo Lime's lime under the Contract of Affreightment, as Dravo Lime's claim is precluded by the entry of default against it in Civil Action No. 00-927. However, the Court

will grant the Dravo parties' motion as to ACBL's contractual indemnity claim against Dravo Lime under the Transportation Agreement in Civil Action No. 02-1157.

An appropriate order follows.

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|                          |     |                                        |
|--------------------------|-----|----------------------------------------|
| MICHAEL BUTCHER,         | )   |                                        |
|                          | )   |                                        |
| Plaintiff,               | )   | Civil Action No. 01-1505               |
|                          | )   |                                        |
| v.                       | )   | Magistrate Judge Lisa Pupo Lenihan     |
|                          | )   |                                        |
| DRAVO CORPORATION, *et al.*, | ) | Doc. Nos. 70, 74, 81 & 96           |
|                          | )   |                                        |
| Defendants.              | )   |                                        |

## ORDER

**AND NOW** this 25th day of March, 2009, **IT IS HEREBY ORDERED** that Price Inland's Motion for Summary Judgment (Doc. No. 70) is **GRANTED** in its favor and against American Commercial Lines, LLC, American Commercial Barge Lines, and Butcher, and **DENIED** as to Dravo Corporation and Dravo Lime Corporation. Judgment is entered in favor of Price and against Butcher on his negligence claim in Civil Action 01-1505. Judgment is entered in favor of Price and against American Commercial Lines, LLC and American Commercial Barge Lines on the latter parties' claim for contractual indemnity in Civil Action No. 01-1357.

**IT IS FURTHER ORDERED** that the counter-motion for summary judgment filed by Dravo Corporation and Dravo Lime Corporation (Doc. No. 81) against Price Inland on the Dravo parties' claim for contribution and/or indemnity is **DENIED**.

**IT IS FURTHER ORDERED** that the Motion for Summary Judgment filed by American Commercial Lines, LLC and American Commercial Barge Lines (Doc. No. 74) is **DENIED** with regard to the negligence claims of Butcher and Dravo Corp., and is **DENIED** with regard to ACBL's contractual indemnity claims against Price and Dravo Lime**.**

**IT IS FURTHER ORDERED** that the counter-motion for summary judgment filed by Dravo Corporation and Dravo Lime Corporation (Doc. No. 96) is **DENIED** as to Dravo Lime's claim that ACBL breached its agreement to provide "suitable" barges for transporting Dravo Lime's lime under the Contract of Affreightment, and **GRANTED** as to ACBL's contractual indemnity claim against Dravo Lime under the Transportation Agreement. Judgment is entered in favor of American Commercial Lines, LLC and American Commercial Barge Lines and against Dravo Lime on Dravo Lime's cross-claim in Civil Action No. 01-1505 for breach of contract. Judgment is entered in favor of Dravo Lime and against American Commercial Lines LLC and American Commercial Barge Lines on American Commercial Barge Line's contractual indemnity claim against Dravo Lime in Civil Action No. 02-1157.

LISA PUPO LENIHAN
United States Magistrate Judge

cc:     All Counsel of Record
        Joseph P. Moschetta, Special Master